627 F.2d 1133
 101 L.R.R.M. (BNA) 3084, 201 U.S.App.D.C. 147,
86 Lab.Cas. P 11482A
 RETAIL STORE EMPLOYEES UNION, LOCAL 1001, RETAIL CLERKS
INTERNATIONAL ASSOCIATION, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Safeco Title Insurance Co., Intervenor.
 No. 76-2015.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued En Banc Feb. 7, 1979.
Judgment June 29, 1979.
Decided Aug. 10, 1979.
Certiorari Granted Jan. 7, 1980. See 100 S.Ct. 658.
 
 On rehearing en banc.
 Laurence Gold, Washington, D. C., with whom James H. Webster, Seattle, Wash., George R. Murphy, J. Albert Woll and Marsha Berzon, Washington, D. C., were on the brief, for petitioner.
 John H. Ferguson, Atty., N.L.R.B., Washington, D. C., with whom John S. Irving, Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., and Anne E. Libbin, Atty., N.L.R.B., Washington, D. C., were on the brief, for respondent.
 Bruce Michael Cross, Seattle, Wash., for intervenor.
 Before WRIGHT, Chief Judge, and BAZELON, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.
 Opinion for the Court filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge, in which WRIGHT, Chief Judge, and BAZELON, McGOWAN and LEVENTHAL, Circuit Judges, concur.
 Dissenting Opinion filed by ROBB, Circuit Judge, in which TAMM, MacKINNON and WILKEY, Circuit Judges, concur.
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge:
 
 
 1
 The principal question before us is whether Section 8(b)(4)(ii)(B) of the National Labor Relations Act[1] interdicts peaceful consumer picketing of neutral retail establishments,[2] designed only to dissuade purchasing of a product supplied by the picketers' employer, when sales of the struck product comprise the great bulk of the neutral retailers' business.[3] We answer the question in the negative.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 Safeco Title Insurance Company, a California corporation, engages in title insurance underwriting and related activities in the State of Washington. In 1974, Local 1001 of the Retail Store Employees Union, Retail Clerks International Association, AFL-CIO, became the certified collective-bargaining representative of certain Safeco employees. Contract negotiations ensued but several months later reached an impasse, whereupon the employees went on strike and began picketing Safeco's office in Seattle. On various occasions thereafter striking employees, with the knowledge and authority of the union, patrolled the premises of one or more of five land title companies having close business ties with Safeco.[4] In each instance, the employees carried signs reading
 
 
 3
 SAFECO NONUNION DOES NOT EMPLOY MEMBERS OF OR HAVE CONTRACT
 
 
 4
 WITH RETAIL STORE EMPLOYEES LOCAL 1001,
 
 
 5
 and distributed handbills to passersby beseeching Safeco policyholders to support the strike by cancelling their insurance. The picketing did not, however, result in any work stoppage at the land title companies or interfere with any deliveries to them.
 
 
 6
 The land title companies conduct real estate title searches, issue title insurance policies and perform escrow services. Safeco underwrites all of their policies,[5] from which their revenues are overwhelmingly derived.[6] Safeco is a substantial stockholder in each of the companies,[7] of which a Safeco officer is invariably a director[8] and usually an officer. Nevertheless, Safeco exercises no control over their personnel policies regarding wages, hours, terms or conditions of employment, nor does Safeco interchange employees with them. None of the employees of the land title companies is represented by a labor organization and, from aught that appears, none performed struck work.
 
 
 7
 The affair became a matter of Board concern when one of the companies[9] filed a complaint characterizing the picketing of its premises as an unlawful secondary boycott and thus an unfair labor practice. Safeco followed shortly thereafter with similar charges of its own. The Board dealt with the litigation directly[10] and, two principal issues evolving from its analysis, it ruled by a bare majority against the union on each.[11] The Board found that the land title companies were neutrals in the dispute between the union and Safeco and accordingly were entitled to claim the protection of Section 8(b)(4)(ii)(B) of the Act.[12] The Board then held that the picketing in question fell within that section's prohibition on secondary boycotts and ordered the union to desist therefrom.[13] The union has petitioned us to review and set aside the Board's order, and the Board has applied for enforcement. We perceive no occasion to disturb the Board's first conclusion,[14] but we are unable to agree with the Board on the second.[15]
 
 II. NEUTRALITY OF THE LAND TITLE COMPANIES
 
 8
 As stated by its legislative sponsor, Section 8(b)(4)(ii)(B) "makes it unlawful to resort to a secondary boycott to injure the business of a third person who is wholly unconcerned in the disagreement between an employer and his employees."[16] And as this court has heretofore cautioned, "(t)he proscription of the sweeping terms of the provision was thus construed to be 'limited to protecting employers in the position of neutrals between contending parties.' "[17] It follows that the picketing at issue may be condemned by that provision only if the land title companies were neutrals vis-a-vis the controversy between Safeco and the union.[18] The Board found that they were, and the union attacks this finding. We think the Board must be sustained on this branch of the litigation.
 
 
 9
 The Board embarked upon its task by recognizing at the outset that "(t)he question of neutrality can be resolved only by considering in each case the factual relationship between the alleged secondary employer and the primary employer in light of the congressional intent to protect employers who are unconcerned and not involved in the labor dispute of the union and the primary employer."[19] The circumstances to be considered, the Board enumerated, "are the degree of common ownership; the common control of day-to-day operations, including labor relations; the extent of integration of business operations; and the dependence of one employer on the other for a substantial portion of its business."[20] "None of these factors," the Board said, "alone is sufficient; rather the Board weighs all of them to determine whether in fact one employer is involved in or is wholly unconcerned with the labor disputes of the other."[21] Adhering to these guidelines, the Board elaborated its conclusion
 
 
 10
 that the land title companies are neutral and separate employers with respect to Safeco's dispute with (the union). Safeco is a minority stockholder in all cases with the exception of Land Title Co. of Clark County, and thus has no potential for exercising control over any but the latter company. The parties stipulated, and we find, that there is no interchange of employees between the land title companies and Safeco and that Safeco has no control over the labor policies of any of the land title companies. And, although the parties stipulated that one member of the board of directors of each of the land title companies (two in the case of Land Title Co. of Clark County) is an officer of Safeco, the record indicates that Safeco is not involved in any way in their day-to-day operations. Safeco is, as (the union) urges, a party to each title insurance policy issued by a land title company. However, the type and degree of collaboration between the principal or underwriter and agent required for the issuance of insurance policies is not such as to warrant a finding that the two are engaged in an integrated business operation. There is no contention that employees of the land title companies were performing struck work. Accordingly the only factor in the instant case which would plausibly negative the claim that the land title companies are neutral employers is their economic dependency on Safeco, since each land title company derives between 90 and 95 percent of its total income from the issuance of Safeco policies. However, in Dow Chemical Company,[22] . . . the Board majority held that economic interdependency alone was not sufficient basis upon which to predicate loss of neutral status. Therefore, we find that the land title companies are secondary employers entitled to the protection of (the secondary boycott provision).[23]
 
 
 11
 Assessments on the factually varying and frequently complex status of neutrality are primarily the function of the Board,[24] whose judgment must be accepted judicially unless contrary to law or unsupported by substantial evidence on the record viewed as a whole.[25] The union does not claim that the factual underpinning for the Board's outcome is insufficient, nor plausibly could it do so; it argues instead that the close business relationship and economic interdependence of Safeco and the land title companies compelled a different result. We are satisfied, however, that mere unity of interests is not enough, nor even is some unity of ownership; there " 'must be in addition such actual or active common control, as distinguished from merely a potential, as to denote an appreciable integration of operations and management policies,' "[26] and surely nothing of that magnitude emerged here. Whatever power Safeco might wield from its stock ownership in the land title companies, there is no suggestion that Safeco is actually involved in their ordinary business operations. Moreover, the parties stipulated and the Board found that there is no interchange of employees, and that the companies are wholly free to formulate and pursue their own labor policies.[27] And while indubitably the relationship between Safeco and the land title companies exudes strong economic interdependence, we have flatly rejected the notion that standing alone that circumstance suffices to dissolve the protection of Section 8(b)(4)(ii)(B).[28]
 
 
 12
 In sum, the Board combed the record for evidence indicative of an alliance between Safeco and the land title companies generating a commonality in labor relations. It isolated all of the facts we can deem material[29] and evaluated them by criteria with which we find no fault.[30] Its quest disclosed no more than the functional integration of a title insurance underwriter and its policy-writing agencies, and the economic dependence of those agencies. That, we hold, is too little to vitiate the Board's conclusion on neutrality.
 
 III. LEGALITY OF THE PICKETING
 A. The Board's Decision
 
 13
 We thus face foursquare the question whether the union's picketing of the land title companies' premises was an unlawful secondary boycott. Section 8(b)(4) (ii)(B) declares it to "be an unfair labor practice for a labor organization or its agents . . . to threaten, coerce, or restrain" a secondary employer "where . . . an object thereof is . . . forcing or requiring (him) to cease using, selling, handling, transporting, or otherwise dealing in the products of" the primary employer.[31] In ruling that the union ran afoul of this injunction, the Board read the Supreme Court's interpretive decision in NLRB v. Fruit & Vegetable Packers Local 700 (Tree Fruits)[32] as varying the operation of the statutory provision in two separate situations. One is where secondary consumer picketing is restricted to an endeavor to persuade customers not to purchase the struck product, activity that Tree Fruits concededly put beyond the pale of illegality.[33] The other is where the picketing is designed to induce customers not to trade with the secondary party at all.[34] The Board obviously relegated to the second category situations of the kind now before us picketing directed exclusively at the struck product, but in circumstances where that product accounts for all or nearly all of the secondary employer's business. The Board had made precisely that classification earlier in its Dow Chemical decision;[35] "(t)he predictability," it now said, "that a successful effort in this regard would result in forcing the secondary employer to go out of business or to abandon the primary employer led the Board to conclude in Dow Chemical that the picketing had an unlawful object."[36] Choosing to travel that path again in the case at bar, the Board reasoned:
 
 
 14
 (T)he facts of the present case indicate that a successful boycott of Safeco insurance policies would predictably involve a virtually complete boycott of the land title companies. Between 90 and 95 percent of the title companies' gross revenues is derived from the issuance of Safeco policies. The remainder is derived from sources which are largely ancillary to the issuance of title insurance policies, e. g., title research and escrow services. (The union's) activities therefore had the predictable result of dragging the land title companies into its dispute with the primary employer, Safeco. The land title companies, powerless to resolve the dispute, would be forced to cease doing business with Safeco or go out of business if the consumer appeal were successful. We find, therefore, that (the union's) consumer appeal constitutes coercion of neutral employers within the meaning of Section 8(b)(4)(ii)(B) of the Act.[37]
 
 
 15
 Tree Fruits and Dow Chemical thus bear heavily upon the construction properly to be given the statutory embargo on secondary boycotts in its relation to the episodes upon which we must pass. We deem it profitable to pause at this point to consider the litigative histories of those cases for such contribution as they may make to solution of the problem at hand.
 
 B. Tree Fruits
 
 16
 Tree Fruits involved picketing at a group of neutral retail stores of the Safeway chain against Washington State apples, one of many items sold in the stores. The picketing was an attempt to support a union's strike against packers and warehousemen supplying those apples. When Tree Fruits was before the Board, it construed Section 8(b)(4)(ii)(B) as preclusive of any and all consumer picketing at the establishment of a neutral.[38] The Board felt, as it did here, that the natural and foreseeable result of such picketing is to force the secondary employer to curtail or cease trading with the primary employer, and that any union engaging in that activity effectively tends to bring about the statutorily forbidden result.[39]
 
 
 17
 On review of that holding, this court, unconvinced that Congress meant to foreclose all secondary consumer picketing as presumptively coercive, reversed the Board's decision.[40] We interpreted the statute as requiring a case-by-case balancing of two incongruent policies: protection of the secondary employer from economic harm, and protection of the union in advocacy of its position to consumers.[41] We held that the factor tipping the scale would be whether the secondary employer suffered or was likely to incur substantial economic injury.[42] Only when such injury was imminent could the Act be invoked to outlaw peaceful picketing, we thought, without infringing First Amendment rights.[43]
 
 
 18
 The Supreme Court, however, rejected both the Board's inferred-intent theory[44] and our economic-impact test.[45] Adhering to its policy of "not ascrib(ing) to Congress a purpose to outlaw peaceful picketing unless 'there is the clearest indication in the legislative history' . . . that Congress intended to do so as regards the particular ends of the picketing under review,"[46] and expressing "concern that a broad ban against peaceful picketing might collide with the guarantees of the First Amendment,"[47] the Court was led by an examination of pertinent legislative history[48] to
 
 
 19
 conclude that (§ 8(b)(4)(ii)(B)) does not reflect with the requisite clarity a congressional plan to proscribe all peaceful consumer picketing at secondary sites, and, particularly, any concern with peaceful picketing when it is limited, as here, to persuading Safeway customers not to buy Washington State apples when they traded in the Safeway stores. All that the legislative history shows in the way of an "isolated evil"[49] believed to require proscription of peaceful consumer picketing at secondary sites was its use to persuade the customers of the secondary employer to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer. This narrow focus reflects the difference between such conduct and peaceful picketing at the secondary site directed only at the struck product.[50]
 
 The Court then explained that difference:
 
 20
 In the latter case, the union's appeal to the public is confined to its dispute with the primary employer, since the public is not asked to withhold its patronage from the secondary employer, but only to boycott the primary employer's goods. On the other hand, a union appeal to the public at the secondary site not to trade at all with the secondary employer goes beyond the goods of the primary employer, and seeks the public's assistance in forcing the secondary employer to cooperate with the union in its primary dispute.[51]
 
 
 21
 So, addressing "the question whether the picketing (there in issue), confined as it was to persuading customers to cease buying the product of the primary employer, falls within the area of secondary consumer picketing which Congress did clearly indicate its intention to prohibit under § 8(b)(4)(ii)," the Court held "that it did not fall within that area, and therefore did not 'threaten, coerce, or restrain' Safeway."[52] The Court delineated its decisional rationale:
 
 
 22
 When consumer picketing is employed only to persuade customers not to buy the struck product, the union's appeal is closely confined to the primary dispute. The site of the appeal is expanded to include the premises of the secondary employer, but if the appeal succeeds, the secondary employer's purchases from the struck firms are decreased only because the public has diminished its purchases of the struck product. On the other hand, when consumer picketing is employed to persuade customers not to trade at all with the secondary employer, the latter stops buying the struck product, not because of a falling demand, but in response to pressure designed to inflict injury on his business generally. In such case, the union does more than merely follow the struck product; it creates a separate dispute with the secondary employer.[53]C. Dow Chemical
 
 
 23
 The specific question here whether secondary consumer picketing limited to the struck product passes muster when that product accounts predominantly or entirely for the secondary employer's revenues came initially before the Board in Dow Chemical.[54] A union on strike against a Dow refinery picketed six neutral service stations in a campaign to dissuade customers from buying "Bay" gasoline, the refinery's product, sales of which produced from 81 to 98 percent of the gross income of five of the six stations. A majority of the Board held the picketing illegal.[55] Acknowledging that under Tree Fruits, Section 8(b)(4)(ii)(B) "does not proscribe peaceful consumer picketing which is employed only to persuade customers not to buy the struck product, as opposed to picketing to persuade consumers to cease all trading with the secondary retailer,"[56] the Board interpreted Tree Fruits as holding "that the minimal impact the picketing there would have had, if successful, upon the total business of the secondary retailer would not justify a conclusion that an object of the union was to persuade the retailer to discontinue handling the struck product to cut its losses. It was on that basis, in our opinion, that it held that the picketing in that case did not 'threaten, coerce, or restrain' the retailer within the meaning of Section 8(b) (4)."[57] As to the six service stations, however, it was the Board's view that
 
 
 24
 the picketing was reasonably calculated to induce customers not to patronize the neutral parties, in this case the gas station operators, at all. Even though some of the stations involved sell tires and provide repair service, which special aspects of their business might be relatively unimpaired, most of their business is gasoline sales and minor items incidental thereto. Some, at least, would predictably be forced out of business if the picketing were successful, and all would predictably be squeezed to a position of duress, escapable only by abandoning Dow in favor of a new source of supply. It is not only the potential impact of the picketing, however, that distinguishes this case from Tree Fruits. It is, more importantly, the predictability of such impact that leads us to conclude that the picketing had an unlawful object.[58]
 
 
 25
 The Board's Dow Chemical ruling was reviewed and unanimously overturned by a panel of this court.[59] The union's victory in Dow Chemical was short-lived, however. The Supreme Court granted certiorari, vacated the panel's judgment and remanded the case "for reconsideration in light of intervening circumstances."[60] On remand, the Board dismissed the complaint after determining that the intervening event dissolution of the union local subsequent to the panel's decision had rendered the controversy moot.[61] In the litigation at bar, the Board adhered to the views it had expressed in its Dow Chemical opinion in lieu of those of the Dow Chemical panel,[62] and once again we are summoned to consider the validity of the grounds advanced by the Board.
 
 D. The Present Case
 
 26
 We approach the problem confronting us with full appreciation of its perplexity. Section 8(b)(4)(ii)(B) is ambiguous on the point at issue; and the Supreme Court's Tree Fruits interpretation of the statutory language, of course, was not an undertaking to deal with every question that conceivably could arise. We would be less than frank if we failed to acknowledge that a good many passages in Tree Fruits can be read in isolation to lend support to either side of the present controversy. Our decision, then, is only what it can be: our very best judgment, guided maximally by Tree Fruits considered as a whole, as to what Congress had in mind.
 
 
 27
 The Board resolved the issue of the legality of the union's picketing by describing it as "reasonably calculated to induce customers not to patronize the neutral parties at all"[63] rather than as "consumer picketing which is employed only to persuade customers not to buy the struck product."[64] Thus characterized, the Board's conclusion, that the union's conduct had an unlawful object, followed automatically.[65] We are unable to accept this summary approach. To begin with, it focuses upon the Supreme Court's Tree Fruits language differentiating proscribed secondary picketing from protected consumer picketing[66] without reference to the remainder of the Court's opinion. Thus stripped of its moorings, classification according to the Tree Fruits dichotomy appears arbitrary in the situation before us. The challenged picketing, as the Board accepted it,[67] was carefully limited to a boycott of the struck product; but, by reason of its vast predominance in the secondary retailers' public offerings, a broad boycott of their businesses became a distinct probability. We think, then, that Tree Fruits must be probed much more deeply for the criterion distinguishing the permissible from the forbidden. We believe that when the union's activities are examined in light of the Tree Fruits opinion in its entirety, they are protected under the Court's interpretation of the Act.
 
 
 28
 As the Court emphasized in Tree Fruits, the "isolated evil" prompting the congressional ban on peaceful consumer picketing at secondary locations "was its use to persuade the customers of the secondary employer to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer."[68] Section 8(b)(4)(ii)(B), so far as relevant here, proscribes peaceful secondary picketing only when it "threaten(s), coerce(s), or restrain(s)" the secondary employer with the object of "forcing or requiring" him "to cease selling, handling, . . . or otherwise dealing in the products of" the primary employer or "to cease doing business with" the latter.[69] Throughout its opinion in Tree Fruits, the Court made it very plain that union activity, even when calculated to thwart sales by the secondary employer of the primary employer's product, is not unlawful unless it "threaten(s), coerce(s), or restrain(s)" the secondary employer within the contemplation of that section.[70] The crucial question in this case, then, is whether that occurred when the union's picketers solicited help from the public in an endeavor to halt transactions in Safeco title insurance.
 
 
 29
 In Tree Fruits, the Court rejected the Board's basic premise "that Congress determined that (secondary consumer) picketing always threatens, coerces or restrains the secondary employer."[71] It also rejected this court's view "that the test of 'to threaten, coerce, or restrain' for the purposes of (that case was) whether Safeway suffered or was likely to suffer economic loss."[72] Instead, the Court took a very different approach in order to determine whether picketing "threaten(s), coerce(s), or restrain(s);" the critical inquiry the Court undertook, simply and solely, was whether the "picketing is employed only to persuade customers not to buy the struck product."[73] That was because, in that event, "the union's appeal is closely confined to the primary dispute,"[74] and while the picketing is extended to the secondary employer's premises, if the union's effort is successful the secondary employer's purchases from the primary employer "are decreased only because the public has diminished its purchases of the struck product."[75] As we ourselves have put it, essentially the union's activity was analogized to "primary picketing at a secondary situs,"[76] and "(i) nsofar as Safeway was pressured by the picketing, that pressure was limited to the portion of Safeway's business that would have been disrupted in any event by a successful primary strike."[77] So, since the union's public appeal merely tracked the flow of the struck apples into Safeway retail outlets, and asked merely that consumers refrain from buying those apples, it was not "within the area of secondary consumer picketing which Congress did clearly indicate its intention to prohibit . . . and therefore did not 'threaten, coerce, or restrain' Safeway."[78]
 
 
 30
 In this rationale we can perceive clearly enough the line of demarcation between what Section 8(b)(4)(ii)(B) leaves unaffected and what it plainly forbids the line distinguishing "between picketing a secondary employer merely to 'follow the struck goods,' and picketing designed to result in a generalized loss of patronage . . .."[79] When the union's secondary picketing is no more than a request that consumers shun the struck product, any diminution of the commerce in the product between the primary and secondary employers is simply a reflection of the consuming public's reaction to the union's limited appeal, geographically extended as it was from the primary to the secondary site. But when the picketing is utilized to induce customers to foresake the secondary employer completely he "stops buying the struck product," the Tree Fruits Court reminds, "not because of a falling demand, but in response to pressure designed to inflict injury on his business generally."[80] As Tree Fruits declares, "(p)eaceful consumer picketing to shut off all trade with the secondary employer unless he aids the union in its dispute with the primary employer, is poles apart from such picketing which only persuades his customers not to buy the struck product."[81] In, the latter case, unlike the former, the union "does more than merely follow the struck product; it creates a separate dispute with the secondary employer."[82]
 
 
 31
 The test of "threaten(ing), coerc(ing), or restrain(ing)" which we thus distill from Tree Fruits is whether the challenged picketing confines its appeal to the struck product in order to reduce the primary employer's market therefor, or whether the picketing projects its force beyond these boundaries. So measured, the activity in the instant case does not contravene the stricture of Section 8(b)(4)(ii)(B). The union had struck and picketed Safeco, the purveyor of title insurance to the public through the land title companies. The union expanded the area of the picketing to include the premises of these companies, and that, for purposes of its decision, the Board took as activity tailored to persuading consumers to boycott Safeco insurance.[83] While most of the companies offered little else title searches and escrow services there is no suggestion that the picketing was structured to affect anything but the struck insurance.[84] The union seemingly was bent on drastically curtailing the market for that product, but that was all.[85] We are thus constrained to hold that the picketing did not "threaten, coerce, or restrain" the land title companies within the meaning of Section 8(b)(4)(ii)(B).
 
 
 32
 The Board rested its contrary conclusion solely on the proposition "that a successful boycott of Safeco insurance policies would predictably involve a virtual complete boycott of the land title companies."[86] That, by the Board's estimate, was enough to transform the picketing into "coercion of neutral employers within the meaning of Section 8(b)(4)(ii)(B) of the Act."[87] Our colleagues in dissent contend similarly that the financial consequences posed for the companies were alone sufficient to trigger the statutory ban on secondary picketing.[88] We think these positions are totally at war with Tree Fruits.
 
 
 33
 The Court's test for coercion, as we have delineated, essentially is whether secondary consumer picketing strikes a blow only at the primary employer's ultimate market for the struck product, and not otherwise at the secondary employer's business. Neither the potential nor the predictable economic consequences for the secondary entrepreneur is the key, nor even a factor in the equation. The Tree Fruits Court's reasoning would seem to make that conclusion evident, and other considerations serve to drive it firmly home. In no wise was the Tree Fruits decision pitched on the degree of financial impact,[89] though the dissenting members of the Court called attention to the milieu we face today.[90] It bears repeating that the Tree Fruits majority disagreed with the earlier view of this court "that the test of 'to threaten, coerce or restrain' for the purposes of this case is whether Safeway suffered or was likely to suffer economic loss."[91] We find it difficult to imagine a more explicit rejection of the economic-impact theory of prohibited coercion.[92]
 
 
 34
 In urging that the foreseeable economic consequences of the union's effort converted an appeal directed solely to the struck product into a prohibited call for a full boycott of the secondary employers' business, the Board and the dissent alike embrace the concept of coercion that Tree Fruits consigned to the graveyard.[93] More than that, they stand the decisional rationale of Tree Fruits on its head. As this court, advertently to Tree Fruits, aptly noted in Dow Chemical,
 
 
 35
 the (Supreme) Court did not say that the picketing in Tree Fruits did not threaten, coerce or restrain Safeway and therefore did not fall within the area Congress intended to prohibit by section 8(b)(4). The Court said that since the picketing was not conduct of the kind which Congress intended to prohibit by that provision, it followed that it did not threaten, coerce or restrain the secondary within the meaning Congress attached to the provision. It was not one of the "isolated evils"[94] intended to be prohibited by section 8(b) (4). The Court viewed Congress as having determined that the possible loss to a secondary caused by this means of publicizing a labor dispute with the producer of the struck products, when weighed against a policy favoring the right peacefully to publicize the dispute, did not outweigh the right.[95]
 
 
 36
 We are mindful of "the primary function and responsibility of the Board to resolve the conflicting interests that Congress has recognized in its labor legislation,"[96] and of the respect normally to be accorded a defensible construction conferred thereon by the Board.[97] But "(t)he deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress,"[98] and it goes without saying that we cannot accept a Board interpretation at odds with the Supreme Court's definitive analysis of the governing statute. As we read Tree Fruits, Congress has itself weighed the policies competing for dominance in the situation at hand, and has cast its lot in favor of picketing designed only to reduce the secondary employer's market for products of the primary employer. Our charge as judges is to remain faithful to that understanding.
 
 
 37
 We believe also that our construction of Section 8(b)(4)(ii)(B) is necessary to avoid a possible confrontation with the First Amendment. When legislation otherwise suspect is fairly susceptible to an interpretation shielding it from constitutional doubt, federal courts are duty bound to give it that reading.[99] In Tree Fruits the Court observed that "(t)hroughout the history of federal regulation of labor relations, Congress has consistently refused to prohibit peaceful picketing except where it is used as a means to achieve specific ends which experience has shown are undesirable."[100] "Both the congressional policy and our adherence to this principle of interpretation," the Court said, "reflect concern that a broad ban against peaceful picketing might collide with the guarantees of the First Amendment."[101] Section 8(b)(4)(ii)(B) has before been accused of encroaching upon those hallowed freedoms,[102] and the Board's nebulous inferred-intent approach to its operation[103] enlivens the specter of constitutional infirmity. Here, no less than in Tree Fruits, the call to sidestep uncertainty of that sort is imperative.[104]
 
 
 38
 The union's petition to set aside the Board's order is accordingly granted, and the Board's application for its enforcement is denied.
 
 
 39
 So ordered.
 
 ROBB, Circuit Judge, dissenting:
 
 40
 The purpose of section 8(b)(4)(ii)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(ii)(B) is to protect neutral employers, not concerned in a dispute between another employer and a union, from the pressures generated by that conflict. NLRB v. Steel Fabricators Local 810 (Sid Harvey ), 460 F.2d 1, 5 (2d Cir. 1972), cert. denied, 409 U.S. 1041, 93 S.Ct. 527, 34 L.Ed.2d 491 (1972); Miami Newspaper Pressmen's Local No. 46 v. NLRB, 116 U.S.App.D.C. 192, 197, 322 F.2d 405, 410 (1963). Congress recognized that absent such protection neutral secondary employers frequently become "the helpless victims of quarrels that do not concern them at all." Carpet Layers Local 419 v. NLRB, 151 U.S.App.D.C. 338, 343, 467 F.2d 392, 397, quoting H.Rep.No. 245, 80th Cong., 1st Sess. 23 (1974).
 
 
 41
 On substantial evidence the Labor Board found, and the majority of this court rightly agrees, that the land title companies were neutrals in the dispute between Safeco and the Union. The majority contends however that because the picketing was aimed at only the "struck product" it was within the exception to section 8(b)(4)(ii)(B) that the Supreme Court recognized in NLRB v. Fruit & Vegetable Packers Local 760 (Tree Fruits ), 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964). I do not agree.
 
 
 42
 The land title companies were not involved in the dispute between Safeco and the Union, and they had no power to resolve that conflict. Yet the majority would expose these neutral employers to the disruption if not the ruin caused by a complete boycott. I cannot believe that the National Labor Relations Act permits such a sacrifice of helpless victims. I think Congress in enacting section 8(b)(4)(ii)(B) intended to forbid union appeals for a complete boycott of a neutral secondary employer. Accordingly I would enforce the order of the National Labor Relations Board.
 
 
 43
 The dispute in Tree Fruits arose between Local 760 of the Fruit & Vegetable Packers and several fruit packers and warehousemen who sold Washington State apples to Safeway retail stores in Seattle, Washington. The union began picketing at the premises of the Safeway stores, urging customers not to buy Washington State apples. The Board ruled that the consumer boycott violated section 8(b)(4)(ii)(B). It reasoned that " 'by literal wording of the (publicity) proviso as well as through the interpretive gloss placed thereon by its drafters, consumer picketing in front of a second establishment is prohibited.' " 132 N.L.R.B. 1172, 1177. This court denied enforcement of the Board's order because no evidence regarding the picket's impact on Safeway sales had been adduced. Fruit & Vegetable Packers Local 760 v. NLRB, 113 U.S.App.D.C. 356, 308 F.2d 311 (1962). We remanded the case to the Board, leaving it free to receive evidence on whether Safeway was in fact threatened, coerced, or restrained.
 
 
 44
 The Supreme Court vacated the judgment of this court and remanded with directions to enter judgment setting aside the Board's order. The Court held that the union's picketing of Washington State apples was legal because it was "employed only to persuade customers not to buy the struck product." 377 U.S. at 72, 84 S.Ct. at 1071. This holding was based on the Court's reading of the legislative history of the 1959 Amendments. The Court concluded that the legislative history did "not reflect with the requisite clarity a congressional plan to proscribe all peaceful consumer picketing at secondary sites." Id. at 63, 84 S.Ct. at 1066. Instead, it showed that the "isolated evil" at which the section was directed was the use of consumer picketing "to persuade the customers of the secondary employer to cease trading with him in order to force (the secondary employer) to cease dealing with, or to put pressure upon, the primary employer." Id. (emphasis added) The Court therefore reasoned that Congress intended not to outlaw boycotts such as Local 760's if directed at only the struck product, but to prohibit "union appeal(s) to the public at the secondary site not to trade at all with the secondary employer." Id.
 
 
 45
 The majority argues in this case that regardless of the intended or foreseeable effect of its picketing on the land title companies, the picketing is lawful under the holding in Tree Fruits because it followed the struck product, Safeco insurance. The Court in Tree Fruits, however, repeatedly stressed that section 8(b)(4)(ii)(B) proscribes picketing which is intended to persuade the customers of a secondary employer to cease dealing with him. And the Board has found here that the Local was seeking a "virtually complete boycott of the land title companies." Thus, the legislative history recounted by the Court in its Tree Fruits opinion amply demonstrates that the Local's conduct was one of the "isolated evils" at which the section was directed.
 
 
 46
 Neither Congress in the legislative history accompanying the 1959 Amendments, nor the Court in its decision in Tree Fruits, intimated that a neutral secondary employer loses his protection against a union-inspired total boycott if his only item of merchandise is the struck product. Thus, Senator McClellan, as revealed in the portion of the legislative history relied on by the Court in its Tree Fruits decision, believed that such employers would be protected:
 
 
 47
 I point out that we have cases of merchants who for 20 years, 10 years, or for a long period of time, may have been handling a particular brand of product. A merchant may have built his business around the product, such as the John Deere plows or some kind of machinery from some other company. The merchant may have built up his trade entirely on that product.
 
 
 48
 II Leg. Hist. 1194. Senator McClellan went on to say that these merchants should be protected from secondary boycotts, including those aimed at their customers. Id.
 
 
 49
 Moreover, instead of suggesting that its holding is applicable to a case like the one before us, the Tree Fruits decision plainly shows that it does not apply to cases in which a retailer sells only the struck product. The Court there recognized that Washington State apples "were only one of numerous food products sold in (Safeway) stores." 377 U.S. at 60, 84 S.Ct. at 1065. Furthermore, the Court believed that if the boycott at Safeway Stores were successful, the harshest result would be that "Safeway (might) drop the item as a poor seller." Id. at 72-73, 84 S.Ct. at 1071; see id. at 72 n.20, 84 S.Ct. at 1071 n. 20. That the Court did not intend the exception it recognized for picketing of struck products to encompass and immunize total boycotts is again manifested by its observation that "consumer picketing to shut off all trade with the secondary employer . . . is poles apart from such picketing which only persuades his customers not to buy the struck product." Id. at 70, 84 S.Ct. at 1070. Picketing to shut off all trade, said the Court is to be barred. Id. at 71, 84 S.Ct. 1063; see id. at 63, 84 S.Ct. 1063. The minimal impact to Safeway that the Court envisioned in Tree Fruits is thus hardly congruent with what the Board found the union's objective to be in this case a total loss of patronage to the land title companies. In Tree Fruits the struck product provided only a small portion of the company's business, so it presented a target separate from the business itself. Here the land title companies sell only insurance underwritten by Safeco and derive 90-95 percent of their income from such sales. Their other income comes from services ancillary to the issuance of title insurance policies. Thus their business is co-extensive with the product.[1]
 
 
 50
 My conclusion is supported by the decision of this court in Honolulu Typographical Union No. 37 v. NLRB, 131 U.S.App.D.C. 1, 401 F.2d 952 (1968), and by the opinions of other circuit courts that have analyzed section 8(b)(4) (ii)(B) since the decision in Tree Fruits.[2] In the Honolulu Typographical case a union engaged in a strike against a newspaper picketed several restaurants that advertised in the struck newspaper. The pickets carried signs stating that the restaurants advertised in the paper, and urging customers not to "purchase their products advertised in the struck" newspaper. The union thus sought to restrict its appeal to a boycott of the "struck product". See 131 U.S.App.D.C. at 3-4, 401 F.2d at 954-55. We concluded, however, that "(t) he only realistic meaning of the appeal is the traditional 'do not patronize this establishment.' " 131 U.S.App.D.C. at 3, 401 F.2d at 954. Relying on the Supreme Court's distinction in Tree Fruits between limited and total boycotts, we held that when the struck product had "so merged into the seller's total business as to be indistinguishable therefrom", a boycott of the struck product was illegal.[3] 131 U.S.App.D.C. at 4-5, 401 F.2d at 955-56. We acknowledged that our interpretation of Tree Fruits granted sellers of a "merged product" greater immunity than that available to ordinary retailers, but we concluded that such protection was justified because:
 
 
 51
 Here, where picketing means a total boycott, one interest must plainly yield, either the Union's desire to maximize pressure on the primary employer (the newspaper) by cutting off its markets or the neutral's desire to avoid a boycott of his entire business. In the 1959 amendments, Congress chose protection of the neutral from this sort of disruption as the interest more deserving of protection.
 
 
 52
 131 U.S.App.D.C. at 5, 401 F.2d at 956.
 
 
 53
 Our holding in Honolulu Typographical Union No. 37 v. NLRB was followed by the Court of Appeals for the Sixth Circuit in American Bread Co. v. NLRB, 411 F.2d 147 (1969). Similarly, in Hoffman v. Cement Masons Local 337, 468 F.2d 1187, 1190-91 (9th Cir. 1972), cert. denied, 411 U.S. 986, 93 S.Ct. 2269, 36 L.Ed.2d 964 (1973), the court reasoned that the Tree Fruits decision is inapposite in a case in which the struck product is the secondary employer's sole product. In both these opinions the courts recognized that the holding in Tree Fruits does not apply when the union appeal necessarily asks for a total boycott of a secondary employer, and that in such instances the interests of the neutral secondary must prevail.
 
 
 54
 Finally, I think "(t)he Board's resolution of the conflicting claims in this case represents a defensible construction of the statute and is entitled to considerable deference." NLRB v. Iron Workers, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978). As an acceptable reading of the statutory language and a reasonable implementation of the purposes of section 8(b)(4)(ii) (B), it is not to be lightly disturbed. Id. at 341, 98 S.Ct. 651. For " '(t) he function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.' " Id. at 350, 98 S.Ct. at 660, quoting Labor Board v. Truck Drivers Union, 353 U.S. 87, 96, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957); Labor Board v. Insurance Agents, 361 U.S. 477, 499, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960).
 
 
 55
 I respectfully dissent. The Board's order should be enforced.
 
 
 
 [1]
 29 U.S.C. § 158(b)(4)(ii)(B) (1976), quoted in relevant part infra note 31
 
 
 [2]
 See Part II infra
 
 
 [3]
 We normally will refer to the supplier with whom the union was in dispute as the primary employer, the picketed retailers of the item supplied by the primary employer as the secondary employers, and the item traded between the two as the struck product
 
 
 [4]
 These companies all Washington corporations are Land Title Company of Clark County, Land Title Company of Cowlitz County, Land Title Company of Kipsap County, Land Title Company of Pierce County and Land Title Company of Snohomish County
 
 
 [5]
 This follows from agency contracts between Safeco and the land title companies individually. Each policy bears Safeco's Seattle address and the signature of Safeco's president, and is countersigned by a land title company employee designated as an authorized officer of Safeco. Safeco's written consent is a prerequisite to commitments of coverage exceeding a limit fixed for each company. The land title companies cannot issue title insurance policies in their own names
 
 
 [6]
 The range is from 90% to 95%
 
 
 [7]
 Safeco's stock ownership is 53% in one of the land title companies and it ranges from 12% to 38% in the other four
 
 
 [8]
 Two directors in one instance and one director in each of the others are Safeco officials. The companies' boards of directors range from six to nine in size
 
 
 [9]
 Land Title Company of Pierce County
 
 
 [10]
 The parties stipulated the salient facts, waived intermediate proceedings before an administrative law judge and submitted the case directly to the Board for decision. The Board approved this course and transferred the litigation to itself
 
 
 [11]
 Retail Store Employees Union Local 1001, 226 N.L.R.B. 754 (1976). The vote was three to two, with Members Fanning and Jenkins dissenting. The union was charged also with a violation of § 8(b)(4)(i)(B), 29 U.S.C. § 158(b)(4)(i) (B) (1976). Since, however, there was no indication that the union had sought to induce any employee to engage in a work stoppage, the Board saw no occasion to assess the union's conduct in light of that section. Id. at 757 n.16
 
 
 [12]
 Id. at 756
 
 
 [13]
 Id. at 757. Safeco argued to the Board, and insists here, that the sign utilized by the picketers contained a false statement and insufficiently identified the struck product. In its view that the picketing was in any event an illegal secondary boycott, the Board deemed it unnecessary to pass on Safeco's contention, Retail Store Employees Local 1001, supra note 11, 226 N.L.R.B. at 757 n.16, and resultantly neither can we. An administrative order must stand or fall on the rationale put forward by the agency, Texas Gas Transmission Corp. v. Shell Oil Co., 363 U.S. 263, 270, 80 S.Ct. 1122, 1126-1127, 4 L.Ed.2d 1208, 1213 (1960); SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1955, 1999 (1947); SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626, 633 (1943), and we are not at liberty to supply "an alternative, unstated ground to support an agency's decision if that ground is one that 'the agency alone is authorized to make.' " Gulf States Utils. Co. v. FPC, 411 U.S 747, 764, 93 S.Ct. 1870, 1880, 36 L.Ed.2d 635, 647 (1973), quoting SEC v. Chenery Corp., supra, 318 U.S. at 88, 63 S.Ct. at 459, 87 L.Ed. at 633. Our disapprobation of the order under review is without prejudice to such consideration as the Board may be inclined to give the pretermitted questions
 
 
 [14]
 Discussed in Part II infra
 
 
 [15]
 Discussed in Part III infra
 
 
 [16]
 93 Cong.Rec. 4198, II Legislative History of Labor-Management Relations Act, 1106 (1947) (remarks of Senator Taft). See also National Woodwork Mfgrs. Ass'n v. NLRB, 386 U.S. 612, 620-633, 87 S.Ct. 1250, 1255-1262, 18 L.Ed.2d 357, 364-371 (1967) (discussion of legislative history)
 
 
 [17]
 Carpet Layers Local 419 v. NLRB, 139 U.S.App.D.C. 68, 71, 429 F.2d 747, 750 (1970), quoting National Woodwork Mfgrs. Ass'n v. NLRB, supra note 16, 386 U.S. at 625, 87 S.Ct. at 1258, 18 L.Ed.2d at 367. See also NLRB v. Steel Fabricators Local 810, 460 F.2d 1, 5 (2d Cir.), cert. denied, 409 U.S. 1041, 93 S.Ct. 527, 34 L.Ed.2d 491 (1972)
 
 
 [18]
 See cases cited supra notes 16-17 and infra notes 26, 28-30. See also note 27 infra
 
 
 [19]
 Retail Store Employees Union Local 1001, supra note 11, 226 N.L.R.B. at 756 (footnote omitted)
 
 
 [20]
 Id. (footnote omitted)
 
 
 [21]
 Id. (footnote omitted)
 
 
 [22]
 211 N.L.R.B. 649 (1974), enforcement denied on other grounds, sub nom. Local 14055, United Steelworkers v. NLRB (Dow Chem.), 173 U.S.App.D.C. 299, 524 F.2d 853 (1975), vacated and remanded, sub nom. Dow Chem. Co. v. Local 14055, United Steelworkers, 429 U.S. 807, 97 S.Ct. 42, 50 L.Ed.2d 68 (1976), complaint dismissed on remand, sub nom. Dow Chem. Co., 229 N.L.R.B. 302 (1977)
 
 
 [23]
 Retail Store Employees Union Local 1001, supra note 11, 226 N.L.R.B. at 756 (footnote omitted)
 
 
 [24]
 Carpet Layers Local 419 v. NLRB, 151 U.S.App.D.C. 338, 347-348, 467 F.2d 392, 401-402 (1972), and cases there cited
 
 
 [25]
 Id. at 348, 467 F.2d at 402, and cases there cited. See also United Tel. Workers v. NLRB, 187 U.S.App.D.C. 231, 234, 571 F.2d 665, 668, cert. denied, 439 U.S. 827, 99 S.Ct. 101, 58 L.Ed.2d 121 (1978)
 
 
 [26]
 American Fed'n of Television Artists v. NLRB, 149 U.S.App.D.C. 272, 277, 462 F.2d 887, 892 (1972), quoting Drivers, Chauffeurs & Helpers Local 639, 158 N.L.R.B. 1281, 1286 (1966). See also Local 391, Int'l Bhd. of Teamsters v. NLRB, 178 U.S.App.D.C. 60, 63, 543 F.2d 1373, 1376 (1976), cert. denied, 430 U.S. 967, 97 S.Ct. 1649, 52 L.Ed.2d 359 (1977)
 
 
 [27]
 The only activity over which Safeco exerts any sort of supervision is the issuance of title insurance commitments above specified dollar limits, and this is no more than a prudent and commonplace control over its liability as an underwriter
 
 
 [28]
 Carpet Layers Local 419 v. NLRB, supra note 24, 151 U.S.App.D.C. at 346-347, 467 F.2d at 400-401. Accord, NLRB v. International Bhd. of Electrical Workers, 542 F.2d 860, 865-866 (2d Cir. 1976). Cf. United Tel. Workers v. NLRB, supra note 25, 187 U.S.App.D.C. at 233, 571 F.2d at 667
 
 
 [29]
 See Local 24, Int'l Bhd. of Teamsters v. NLRB, 105 U.S.App.D.C. 271, 276, 266 F.2d 675, 680 (1959) (Board erred in failing to consider all material facts)
 
 
 [30]
 See NLRB v. Steel Fabricators Local 810, supra note 17, 460 F.2d at 5-6
 
 
 [31]
 National Labor Relations Act, § 8(b)(4)(ii)(B), 29 U.S.C. § 158(b)(4)(ii) (B) (1976), providing in pertinent part:
 It shall be an unfair labor practice for a labor organization or its agents
 (4) . . . (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize, or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary . . . picketing . . . .
 Section 158(b)(4) is subject to the further proviso that
 nothing contained in (paragraph 4) shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public . . . , that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution.
 (Emphasis supplied).
 
 
 [32]
 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964), rev'g, 113 U.S.App.D.C. 356, 308 F.2d 311 (1962), rev'g, 132 N.L.R.B. 1172 (1961). Unless otherwise indicated, our references to Tree Fruits are to the Supreme Court's decision therein
 
 
 [33]
 Retail Store Employees Union Local 1001, supra note 11, 226 N.L.R.B. at 757
 
 
 [34]
 Id
 
 
 [35]
 Supra note 22
 
 
 [36]
 Retail Store Employees Union Local 1001, supra note 11, 226 N.L.R.B. at 757
 
 
 [37]
 Id. (footnote omitted)
 
 
 [38]
 Tree Fruits, supra note 32, 132 N.L.R.B. 1172, 1177
 
 
 [39]
 Id. at 1177-1178
 
 
 [40]
 Tree Fruits, supra note 32, 113 U.S.App.D.C. 356, 308 F.2d 311
 
 
 [41]
 Id. at 362-363, 308 F.2d at 317-318
 
 
 [42]
 Id
 
 
 [43]
 Id
 
 
 [44]
 Tree Fruits, supra note 32, 377 U.S. 58, 62-72, 84 S.Ct. 1063, 1066-1071, 12 L.Ed.2d 129, 133-139
 
 
 [45]
 Id. at 73, 84 S.Ct. at 1071, 12 L.Ed.2d at 139
 
 
 [46]
 Id. at 63, 84 S.Ct. at 1066, 12 L.Ed.2d at 133, quoting NLRB v. Local 639, Int'l Bhd. of Teamsters, 362 U.S. 274, 284, 80 S.Ct. 706, 712, 4 L.Ed.2d 710, 718 (1960)
 
 
 [47]
 Tree Fruits, supra note 32, 377 U.S. at 63, 84 S.Ct. at 1066, 12 L.Ed.2d at 133
 
 
 [48]
 That is, the history of amendments to § 8(b)(4), 29 U.S.C. § 158(b)(4) (1976), effected by the Labor Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act), § 704(a), 73 Stat. 542, 29 U.S.C. § 158(b)(4) (1976)
 
 
 [49]
 The quoted words are from NLRB v. Local 639, Int'l Bhd. of Teamsters, supra note 46, 362 U.S. at 284, 80 S.Ct. at 712, 4 L.Ed.2d at 718 ("(i)n the sensitive area of peaceful picketing Congress has dealt explicitly with isolated evils which experience has established flow from such picketing")
 
 
 [50]
 Tree Fruits, supra note 32, 377 U.S. at 63, 84 S.Ct. at 1066, 12 L.Ed.2d at 133-134
 
 
 [51]
 Id. at 63-64, 84 S.Ct. at 1066-1067, 12 L.Ed.2d at 134 (footnote omitted)
 
 
 [52]
 Id. at 71, 84 S.Ct. at 1071, 12 L.Ed.2d at 138
 
 
 [53]
 Id. at 72, 84 S.Ct. at 1071, 12 L.Ed.2d at 138-139 (footnote omitted)
 
 
 [54]
 Supra note 22
 
 
 [55]
 211 N.L.R.B. 649 (1974). Members Fanning and Jenkins, the dissenters in the instant litigation, dissented there also
 
 
 [56]
 Id. at 651
 
 
 [57]
 Id
 
 
 [58]
 Id. at 651-652
 
 
 [59]
 Dow Chem., supra note 22, 173 U.S.App.D.C. 299, 524 F.2d 853 (1975)
 
 
 [60]
 Dow Chem., supra note 22, 429 U.S. 807, 97 S.Ct. 42, 50 L.Ed.2d 68 (1976)
 
 
 [61]
 Dow Chem., supra note 22, 229 N.L.R.B. 302 (1977)
 
 
 [62]
 Retail Store Employees Union Local 1001, supra note 11, 226 N.L.R.B. at 757 & n.15. We need not ponder whether vacatur of the panel's judgment in Dow Chemical robbed the accompanying opinion of the precedential force it otherwise would have commanded. Whatever its status as precedent, it cannot be gainsaid that the value of its reasoning endures
 
 
 [63]
 Id. at 757
 
 
 [64]
 Id
 
 
 [65]
 Id
 
 
 [66]
 See text supra at note 50
 
 
 [67]
 See note 13 supra
 
 
 [68]
 See text supra at note 50
 
 
 [69]
 See note 31 supra
 
 
 [70]
 As we noted in Honolulu Typographical Union 37 v. NLRB, 131 U.S.App.D.C. 1, 4 n.7, 401 F.2d 952, 955 n.7 (1968), "(t)he Court apparently did not question that the object of the picketing was to force Safeway to cease dealing in struck Washington apples by making it unprofitable to do so."
 
 
 [71]
 Tree Fruits, supra note 32, 377 U.S. at 62, 84 S.Ct. at 1066, 12 L.Ed.2d at 133
 
 
 [72]
 Id. at 72, 84 S.Ct. at 1071, 12 L.Ed.2d at 139
 
 
 [73]
 See text supra at note 53
 
 
 [74]
 See text supra at note 53
 
 
 [75]
 See text supra at note 53
 
 
 [76]
 Honolulu Typographical Union 37 v. NLRB, supra note 70, 131 U.S.App.D.C. at 4, 401 F.2d at 955
 
 
 [77]
 Id. (footnotes omitted)
 
 
 [78]
 See text supra at note 52
 
 
 [79]
 Tree Fruits, supra note 32, 377 U.S. at 64 n.7, 84 S.Ct. at 1067 n.7, 12 L.Ed.2d at 134 n.7
 
 
 [80]
 See text supra at note 53
 
 
 [81]
 Tree Fruits, supra note 32, 377 U.S. at 70, 84 S.Ct. at 1070, 12 L.Ed.2d at 137-138
 
 
 [82]
 See text supra at note 53
 
 
 [83]
 See note 13 supra. We are mindful that the leaflets distributed by the picketers asked the public to cancel outstanding policies of any type issued by four named insurance companies comprising the Safeco Group. However, the proviso to § 8(b)(4)(ii)(B), quoted supra note 31, "authorize(s) publicity other than picketing which persuades the customers of a secondary employer to stop all trading with him," though "not such publicity which has the effect of cutting off his deliveries or inducing his employees to cease work," nor "picketing which persuades the customers of a secondary employer to stop all trading with him . . ." Tree Fruits, supra note 32, 377 U.S. at 70-71, 84 S.Ct. at 1070, 12 L.Ed.2d at 138
 
 
 [84]
 Safeco attempts to distinguish the present case from Tree Fruits on the theory that Safeco title insurance was integrated into the overall service offered by the land title companies, Brief for Intervenor at 11-14; Supplemental Brief for Intervenor at 7-13, and thus that the "merged-product" doctrine is applicable. See note 93 infra. It suffices to point out that the Board, while noting that Safeco had advanced that argument, discarded it instead and predicated its decision exclusively on the fact that Safeco title insurance predominated the companies' sales. Retail Store Employees Union Local 1001, supra note 11, 226 N.L.R.B. at 757; Part I supra. "(W)e cannot 'accept appellate counsel's post hoc rationalizations for agency action'; for an agency's order must be upheld, if at all, 'on the same basis articulated in the order by the agency itself.' " FPC v. Texaco, Inc., 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141, 156 (1974), quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-169, 83 S.Ct. 239, 246, 9 L.Ed.2d 207, 216 (1962). See also note 13 supra
 
 
 [85]
 Our brethren in dissent say that the legislative history of the 1959 amendments is devoid of any intimation that a secondary retailer was to be exposed to consumer picketing against the struck product when that product is his only item of merchandise. Dissenting Opinion (Dis.Op.) 201 U.S.App.D.C. at ---, 627 F.2d at 1149. This observation is beside the point. The appropriate inquiry on congressional intent is not for some mere hint one way or the other but instead for "the clearest indication" of a purpose to outlaw the involved mode of peaceful picketing. See text supra at note 52. As the dissenters note, Senator McClellan, in support of his anti-boycott bill, described the plight of the merchant who has built his business around a single product. But the Senator's statement, examined in its entirety, indicates that he was concerned with picketing aimed at disrupting the merchant's business generally, not with a narrowly focused consumer boycott of the struck product. 105 Cong.Rec. 6667 (1959). For a similar understanding of the Senator's remarks, see Tree Fruits, supra note 32, 377 U.S. at 65-66, 84 S.Ct. at 1067-1068, 12 L.Ed.2d at 135
 
 
 [86]
 See text supra at note 37
 
 
 [87]
 See text supra at note 37
 
 
 [88]
 Dis.Op. passim
 
 
 [89]
 As the Board members dissenting in this litigation observed, there is nothing in Tree Fruits "which indicates that consumer picketing, otherwise lawful, becomes unlawful when it may leave the inconsequential or ineffective level and have a significant impact on the secondary's business in which he sells the struck product." Retail Store Employees Union Local 1001, supra note 11, 226 N.L.R.B. at 758. See also the discussion in Dow Chem., supra note 22, 173 U.S.App.D.C. at 303-304, 305-306, 524 F.2d at 857-858, 859-860. And see Local 150, Int'l Bhd. of Teamsters, 151 N.L.R.B. 734, 740 (1965) ("(i)f the picketing is lawful, the possible economic consequences are immaterial")
 
 
 [90]
 See note 103 infra
 
 
 [91]
 Tree Fruits, supra note 32, 377 U.S. at 72, 84 S.Ct. at 1071, 12 L.Ed.2d at 139
 
 
 [92]
 The dissent argues that, having accepted the Board's finding that the land title companies were neutral despite their heavy trafficking in Safeco title insurance, we render that finding largely nugatory when we sanction peaceful picketing to dissuade public purchase of that insurance. Dis.Op. 201 U.S.App.D.C. at --- n.3, 627 F.2d at 1150-1151 n.3. We cannot agree. Lack of neutrality would per se have validated the picketing, see Part II supra, but the picketing cannot be made unlawful by the fact of neutrality alone. We thus can perceive no inconsistency in these two holdings
 
 
 [93]
 The dissent claims support from Honolulu Typographical Union 37 v. NLRB, supra note 70, wherein we sustained a Board holding that § 8(b)(4)(ii)(B) barred picketing urging patrons of restaurants to forego consumption of products advertised in a struck newspaper. Dis.Op. 201 U.S.App.D.C. at, ---, 627 F.2d at 1149-1151. We wonder just how much assistance Honolulu Typographical could be expected to provide here since the court there was careful to warn that it "need not decide" nor did it even "intimate a view on . . . the hard problem posed" for decision today. Id. at 5 n.9, 401 F.2d at 956 n.9
 Honolulu Typographical and other merged-product cases seem readily distinguishable. There is a decisionally-significant difference between a secondary employer's sales of a struck product in the form in which it leaves the primary employer, and sales by the secondary employer of goods or services into which the struck product has been so integrated as to lose its separate identity for all practical purposes. In the former situation, the primary employer and the secondary retailer cater to the same body of eventual consumers; the secondary retailer's immediate market is also the primary employer's ultimate market, and a union boycott can be structured to follow the struck product into that market without implicating any other product in the secondary employer's inventory. When, however, the struck product has been so blended with another product as to become an integral part of a materially different product, the primary employer and the secondary retailer no longer deal in the same product and share a common market. The struck product no longer has a market of its own, and it cannot be pursued into the market for the merged product without implicating its other components. The stark fact of the matter is that a discrete consumer boycott of the struck product, given its newly-acquired character, is simply not possible. See id. at 4, 401 F.2d at 955.
 The decided cases vividly illustrate the contrast. In Honolulu Typographical, restaurant customers acceding to the union's supplication would have had to boycott meals products, of course, not supplied by the primary employer, the newspaper. Similarly, in American Bread Co. v. NLRB, 411 F.2d 147 (6th Cir. 1969), in order to boycott a struck product bread customers of picketed restaurants would have had to pass up meals that included bread, thus effectively spreading the boycott to products not encompassed by the dispute with the primary employer. In the case at bar, however, consumers were neither required nor requested to boycott any neutral product in order to honor the picketers' appeal. Neutral secondary employers are legally susceptible to consumer picketing under Tree Fruits, but only insofar as the boycott of the struck product does not spill over into other phases of the secondary enterprise. In true merged-product cases, however, the notion that the struck product is being followed to the consumer becomes so tenuous as to lose touch with reality. Honolulu Typographical Union 37 v. NLRB, supra note 70, 131 U.S.App.D.C. at 4, 401 F.2d at 955.
 
 
 [94]
 See note 49 supra and accompanying text
 
 
 [95]
 Dow Chem., supra note 22, 173 U.S.App.D.C. at 304-305, 524 F.2d at 858-859 (footnote omitted)
 
 
 [96]
 NLRB v. Insurance Agents' Int'l Union, 361 U.S. 477, 499, 80 S.Ct. 419, 432, 4 L.Ed.2d 454, 470 (1960). See also NLRB v. Local 103, Int'l Ass'n of Iron Workers, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586, 598-599 (1978); NLRB v. Truck Drivers Local 449, Int'l Bhd. of Teamsters, 353 U.S. 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676, 682 (1957)
 
 
 [97]
 NLRB v. Local 103, Int'l Ass'n of Iron Workers, supra note 96
 
 
 [98]
 American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855, 867 (1965). See also NLRB v. Insurance Agents' Int'l Union, supra note 96, 361 U.S. at 499, 80 S.Ct. at 432, 4 L.Ed.2d at 470
 
 
 [99]
 Johnson v. Robison, 415 U.S. 361, 367, 97 S.Ct. 1160, 1165-1166, 39 L.Ed.2d 389, 398 (1974); United States v. Thirty-seven Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404-1405, 28 L.Ed.2d 822, 830 (1971); United States v. Rumely, 345 U.S. 41, 45, 73 S.Ct. 543, 545, 97 L.Ed. 770, 775 (1953)
 
 
 [100]
 Tree Fruits, supra note 32, 377 U.S. at 62, 84 S.Ct. at 1066, 12 L.Ed.2d at 133
 
 
 [101]
 Id. at 63, 84 S.Ct. at 1066, 12 L.Ed.2d at 133
 
 
 [102]
 Id. at 76, 84 S.Ct. at 1073, 12 L.Ed.2d at 141 (Black, J., concurring). In the instant case, the union levels a similar attack. Brief for Petitioner at 21-25; Supplemental Brief for Petitioner at 14-18
 
 
 [103]
 See text supra at notes 34-37. See also Tree Fruits, supra note 32, 377 U.S. at 82-83, 84 S.Ct. at 1076-1077, 12 L.Ed.2d at 144-145 (Harlan, J., dissenting)
 
 
 [104]
 "We think that in light of Tree Fruits we may not hold Congress intended by section 8(b)(4) that the exercise of the arguable First Amendment right should turn for its lawfulness upon a factor exceedingly difficult to subject to line-drawing, and as to which a union exercising the claimed right might have poor information as to where to draw the line." Dow Chem., supra note 22, 173 U.S.App.D.C. at 307, 524 F.2d at 861
 
 
 [1]
 Nor does the section's prohibition against the picketing in this case raise substantial first amendment questions; for "(r)ead as barring only picketing urging total consumer boycott, . . . the statute strikes narrowly at those 'inherently compulsive features' present when consumers must cross a line." Honolulu Typographical Union No. 37 v. NLRB, 131 U.S.App.D.C. 1, 6 n.11, 401 F.2d 952, 957 n.11 (1968); see Teamsters Local 695 v. Vogt, Inc., 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957); Hughes v. Superior Court, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950)
 
 
 [2]
 The only circuit court opinion that has reached a contrary result is the panel decision of this court in United Steelworkers Local 14055 v. NLRB (Dow Chemical), 173 U.S.App.D.C. 299, 524 F.2d 853 (1975), noted in 7 Tex.Tech.L.Rev. 645 and 54 U.Det.J.Urb.L. 579. The panel held that consumer picketing was lawful so long as it followed the struck product, regardless of its foreseeable effect on the secondary employers whose revenues were derived primarily from the sale of the struck product. The Supreme Court however vacated the judgment in that case and remanded the case with directions to remand the case to the Board for reconsideration in light of intervening circumstances. 429 U.S. 807, 97 S.Ct. 42, 50 L.Ed.2d 68. On remand the Board dismissed the complaint as moot. 229 N.L.R.B. No. 43, 96 L.R.R.M. 1090 (April 27, 1977)
 The Union concedes that the opinion in Dow Chemical is not controlling. Brief for Petitioner at p. 11 n.6; see New York Stock Exchange, Inc. v. Bloom, 183 U.S.App.D.C. 217, 224 n.6, 562 F.2d 736, 743 n.6 (1977), cert. denied, 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978) ("the precedential value of this court's decision . . . was substantially diminished by the action of the Supreme Court in taking the case for review on the merits, which did not come about only by reason of the intervention of mootness").
 The Board in its opinion in this case fully considered the views expressed by the panel in Dow Chemical, see J.A. 10 n.15, but it declined to adopt the holding of that case. Similarly, I have considered the thinking of the panel there, but for the reasons stated in the text I reach a different result.
 
 
 [3]
 In Honolulu Typographical, 131 U.S.App.D.C. at 5 n.9, 401 F.2d at 956 n.9, we observed that when a secondary employer sells only the struck product, the concept of neutrality and the applicability of Tree Fruits may become intertwined. This is indeed true. In Carpet Layers, supra, we held that a secondary employer did not become allied merely because he was economically dependent on the primary. Accord, NLRB v. Electrical Workers Local 3, 542 F.2d 860, 865-66 (2d Cir. 1976); Kinty v. UMW, 544 F.2d 706, 717 (4th Cir. 1976), cert. denied, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977). We therefore held that the secondary employer in that case was protected by section 8(b)(4)(ii)(B). Similarly, in this case we have affirmed the Board's finding that the land title companies were neutral notwithstanding that they sell only Safeco insurance. By holding lawful a total boycott of these neutral secondary employers because it was aimed at only the struck product the companies' sole product we would render our holding in Carpet Layers and the Board's finding largely meaningless