**J. F. HOFF ELECTRIC COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

Local Union 323, International Brotherhood of Electrical Workers, Intervenor.

No. 79–1450.

United States Court of Appeals, District of Columbia Circuit.

Argued April 25, 1980.

Decided Sept. 12, 1980.

Certiorari Denied April 20, 1981. See 101 S.Ct. 1997.

William R. Radford, Miami, Fla., for petitioner. Peter J. Hurtgen, Washington, D. C., also entered an appearance for petitioner.

Richard B. Bader, Atty., N. L. R. B., Washington, D.C., with whom Robert E. Allen, Acting Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., were on brief, for respondent.

Robert Lewis, Roger S. Kaplan, and Stephen A. Bokat, Washington, D.C., were on brief, for amicus curiae, Chamber of Commerce of the United States of America, urging the granting of the petition for review and case remand.

Thomas X. Dunn, and Laurence J. Cohen, Washington, D.C., were on brief, for amicus curiae, Building and Construction Trades Department, AFL–CIO, urging denial of the petition for review.

Joseph H. Kaplan, Miami, Fla., was on brief, for intervenor. Joseph C. Segor, Miami, Fla., also entered an appearance for intervenor.

Before WRIGHT, Chief Judge, and WILKEY and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Dissenting opinion filed by Circuit Judge WILKEY.

**1268**

WALD, Circuit Judge:

█ This case poses the problem of whether a "neutral gate," set up by a construction contractor to insulate neutral employers at a common site from the impact of union picketing, lost its protected status when supplies, intended to be used by the primary employer[1] but ordered and owned by the owner of the construction project, were delivered through the gate. The primary employer, J. F. Hoff Electric Company, filed an unfair labor practice charge with the National Labor Relations Board when the Local 323, Int'l Brotherhood of Electrical Workers, picketed the gate, charging that the Union had violated the "secondary picketing" ban of Section 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(i) and (ii)(B).[2] The NLRB ruled that the gate had lost its neutral status, at least temporarily, and dismissed Hoff's unfair labor practice complaint. Hoff has appealed the dismissal. We affirm the Board's action.

## FACTS

Hoff, which employs non–union workers, was engaged to install the electrical system on a residential construction project in North Palm Beach, Florida. The project itself was located at the extreme southern end of a site which was more than 1600 feet long. There were only two gates into the project; the "reserved" north gate, at the far end of the site away from the project, which was marked for the use of Hoff's employees, suppliers, and certain other subcontractors, and the "neutral" south gate near the construction project which was used by everyone else connected with the project. During the course of construction, once or twice a week as needed by Hoff but not on any fixed schedule, Consolidated Electric Supply Company delivered electrical fixtures ordered by the project owner to a trailer on the site. Hoff employees picked up the fixtures at the trailer and installed them in the new buildings. Consolidated used the south gate for such deliveries. In November, 1977, the Union began picketing at the north gate publicizing and protesting the fact that Hoff employees were paid less than Union wages. In December, 1977, picketers saw Consolidated delivering electrical fixtures through the south gate and moved their pickets to that

1. In secondary boycott cases, the "primary employer" is the employer with which the Union is embroiled in a labor dispute.

2. The statute provides:
   It shall be an unfair labor practice for a labor organization or its agents . . . (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is–

   . . . . .

   (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, . . . Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

   . . . . .

Provided, That nothing contained in this subsection (b) shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this Act:
Provided further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution [.]

gate. They also began picketing along the fence between the south gate and the southernmost boundary of the project. After four days Hoff wrote the Union assuring it that Hoff and its suppliers would henceforth use only the north gate; on its attorney's advice, the Union's pickets thereupon withdrew from the south gate. They continued to picket in front of the area of construction work, however, several hundred feet away from the south gate.[3]

## THE BOARD'S DECISION

The Board adopted the findings of its Administrative Law Judge (ALJ), ruling that the neutrality of the south gate had been breached by delivery of Consolidated's fixtures to be installed by Hoff and thus the Union committed no violation of 8(b)(4) by picketing at that gate. The Board relied on *Int'l Union of Operating Engineers, Local No. 450 (Linbeck Construction Corp.),* 219 NLRB 997 (1975), *enforced,* 550 F.2d 311 (5th Cir. 1977), for the proposition that "any gate used to deliver materials essential to the primary employer's normal operations is subject to lawful picketing," 550 F.2d at 318.[4] The Board also unanimously found that the picketing along the southernmost end of the project site was lawful and unrelated to any secondary intent, applying the four–prong test set out in *Sailors' Union of the Pacific (Moore Dry Dock Company),* 92 NLRB 547 (1950), which is used to determine the permissible scope of picketing a site shared by many employers.

## THE PERMISSIBLE SCOPE OF CONSTRUCTION SITE PICKETING

■ 1. *Settled Principles*: It is settled that a union may picket a primary employer with which it has a labor dispute; indeed, such picketing is expressly exempted from the prohibitions contained in section 8(b)(4).[5] The Union may not, however, picket a neutral employer in order to force that employer to cease doing business with the primary employer. Such picketing is "secondary" in that it constitutes an attempt to draw a neutral party into the dispute between the union and the primary employer, a dispute in which the secondary employer has no direct interest, and which it is powerless to resolve. On construction sites, where many subcontractors work side by side and are dependent upon each other, the attempt to reconcile these principles and to accommodate both the legitimate interest of the union in bringing economic pressure to bear on the primary employer through picketing, and the interests of neutral employers who wish not to be involved in the dispute, has proved especially difficult. In an attempt to strike a reasonable balance among the competing interests in this situation, certain rules and practices have been evolved by the Board and approved by the courts. In *Moore Dry Dock, supra,* 92 NLRB 547, the Board announced several criteria which, if met, raise a presumption that common situs picketing is directed against the primary and not a secondary employer. Those rules are:

[P]icketing of the premises of a secondary employer is primary if it meets the following conditions: (a) The picketing is strictly limited to times when the *situs* of dispute is located on the secondary employer's premises; (b) at the time of the

3. In January, 1978, a U.S. District Court enjoined all picketing except in the immediate vicinity of the north gate.

4. Member Murphy dissented as to this aspect of the case. She emphasized the fact that in *Linbeck* the delivery was of crushed stone raw material to be converted by the primary employer into a finished product, while here finished fixtures were delivered which in her view were not "materials used" by the primary employer, or supplies "essential to [its] normal operations." The Board's answer to Member Murphy's dissent was that

[t]he contention that delivery of electrical fixtures is not "essential" to the operations of an electrical contractor charged as here with installation of an electrical system for a general contractor is a contention that falls of its own weight and the rationale of the Board's decision in *Linbeck* is fully applicable here in dismissing the instant complaint.

5. *"Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing[.]" 29 U.S.C. § 158(b)(4)(ii)(B).

picketing the primary employer is engaged in its normal business at the *situs*; (c) the picketing is limited to places reasonably close to the location of the *situs*; and (d) the picketing discloses clearly that the dispute is with the primary employer.

*Id.*, at 549 (footnotes omitted).

■ It has also been decided by the Board and the courts that in order to isolate a labor dispute and to minimize disruption of the entire work force in common work situs situations, special gates may be reserved for the subcontractor who is the object of picketing. So long as the employees and suppliers of that subcontractor are limited to that gate, the union may not picket the "neutral gate" used by others not involved in the dispute. A case involving picketing at a plant owned by the primary employer, *Local 761, Int'l Union of Electrical Workers v. NLRB (General Electric),* 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961), established the legitimacy of a limitation of picketing to specially designated gates used by the primary object of the picketing. At the same time, the Court cautioned against any "mechanically applied" tests that disregard the fundamental criteria: the object of the picketing, if it is to be legitimate, must be limited to disruption of the *primary* employer's business. If, from all the circumstances it can be determined that the object of the picketing is inducement of secondary employees to strike, thus forcing their employer to cease *doing* business with the primary employer, the picketing is unlawful secondary activity. The Court acknowledged:

Important as is the distinction between legitimate "primary activity" and banned "secondary activity," it does not present a glaringly bright line. The objectives of any picketing include a desire to influence others from withholding from the employer their services or trade. "[I]ntended or not, sought for or not, aimed for or not, employees of neutral employers do take action sympathetic with strikers and do put pressure on their own employers." ... But picketing which induces secondary employees to respect a picket line is not the equivalent of picketing which has an object of inducing those employees to engage in concerted conduct against their employer in order to force him to refuse to deal with the struck employer.

However difficult the drawing of lines more nice than obvious, the statute compels the task. Accordingly, the Board and the courts have attempted to devise reasonable criteria drawing heavily upon the means to which a union resorts in promoting its cause. Although "[n]o rigid rule which would make ... [a] few factors conclusive is contained in or deducible from the statute," ... "[i]n the absence of admissions by the union of an illegal intent, the nature of acts performed shows the intent."

*Id.* at 673–74, 81 S.Ct. at 1289 (citations and footnotes omitted). In upholding the struck employer's right to assign a gate to independent contractors not involved in the dispute in order to insulate them from the effects of picketing, the Court was careful to assure the Union that the practice could not be used to keep pickets away from customers or suppliers of the primary employer:

The Union claims that, if the Board's ruling is upheld, employers will be free to erect separate gates for deliveries, customers, and replacement workers which will be immunized from picketing. This fear is baseless. The key to the problem is found in the type of work that is being performed by those who use the separate gate. It is significant that the Board has since applied its rationale, first stated in the present case, only to situations where the independent workers were performing tasks unconnected to the normal operations of the struck employer—usually construction work on his buildings. In such situations, the indicated limitations on picketing activity respect the balance of competing interests that Congress has required the Board to enforce. On the other hand, if a separate gate were devised for *regular plant deliveries, the barring of picketing at that location would make a clear invasion on traditional pri-*

mary activity of appealing to neutral employees whose tasks aid the employer's everyday operations.

*Id.* at 680–81, 81 S.Ct. at 1293 (emphasis added).[6]

In a second "reserved gate" case, *United Steelworkers of America v. NLRB (Carrier Corp.)*, 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964), the Court found picketing legitimate at a special railroad spur track, owned by and reserved for employees of the neutral railroad to get onto the primary employer's premises to make deliveries and pick up shipments. The determinative fact was not that the gate belonged to a neutral party, the railroad, but that the neutral deliverymen were furnishing routine services essential to the employer's normal operations and so were legitimate objects of the picketing union's appeal. Again the Court emphasized, speaking about *General Electric*:

> The legality of separate gate picketing depended upon the type of work being done by the employees who used that gate; if the duties of those employees were connected with the normal operations of the employer, picketing directed to them was protected primary activity, but if their work was unrelated to the day–to–day operation of the employer's plant, the picketing was unfair labor practice.

376 U.S. at 497–98, 84 S.Ct. at 903. The Court specifically rejected any rule which would make picketing unlawful at gates used only by delivery personnel as opposed to employees of the primary employer:

> Picketing has traditionally been a major weapon to implement the goals of a strike and has characteristically been aimed at *all those approaching the situs whose mission is selling, delivering or otherwise contributing to the operations which the strike is endeavoring to halt.*

In light of this traditional goal of primary pressures we think Congress intended to preserve the right to picket during a strike a gate reserved for employees of *neutral delivery men furnishing day–to–day service essential to the plant's regular operations.*

376 U.S. at 499, 84 S.Ct. at 904 (emphasis added).

Thus, so long as the *Moore Dry Docks* limitations are met, a union may legitimately picket at a common work situs in such a way that all employees, suppliers, and customers of the primary employer are reached by the pickets; neutral employers may insulate themselves from the picketing only if the reserved gate practice is faithfully observed. These principles are not in dispute in this case; since Consolidated concededly used the neutral south primary gate regularly, our analysis would end here were it not for the argument advanced by Hoff that Consolidated was not one of *its* suppliers, but rather a supplier to the project owner who ordered and paid for the fixtures, and thus was in fact simply another subcontractor on the project, making deliveries to the owner, and properly using the neutral gate. The issue of who must use the reserved gate in order to avoid the legitimate picketing of an assertedly "neutral" gate is the focus of the dispute in this case.

2. *The Legal Ownership Argument*: In *NLRB v. Denver Building & Construction Trades Council*, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951), the Supreme Court established the principle that, despite their interdependence, not all subcontractors on a construction project can be considered legitimate objects of picketing when the dispute is with but one of them. The case concerned a strike the avowed object of which was to force a general contractor on a construction project to terminate its contract

---

**6.** Speaking of Sec. 8(b)(4)(A) the Court said: Thus the section "left a striking labor organization free to use persuasion, including picketing, not only on the primary employer and his employees but on numerous others. Among these were secondary employees who were customers or suppliers of the primary

employer and persons dealing with them ... so long as the labor organization did not ... 'induce or encourage the employees of any employer to engage in a strike or a concerted refusal in the course of their employment' ...."

*Id.* at 672, 81 S.Ct. at 1289.

with a particular nonunion subcontractor. The Court found such a strike to be prohibited under Section 8(b)(4). Rejecting an argument that the mutual reliance of one contractor on all others at a construction site renders the entire project a legitimate object of the union's pressure, the Supreme Court held that the mere fact that each is working on the same project does "not eliminate the status of each as an independent contractor or make the employees of one the employees of the other." *Id.* at 689–90, 71 S.Ct. at 952. Hoff argues that here both Consolidated and the project owner were "independent" of it because Hoff neither owned the fixtures nor was contractually bound to supply them, therefore the neutrality of the south gate was not breached and picketing directed to Consolidated's deliveries was unlawful secondary activity.

Hoff's interpretation of *Denver Building* would expand that case far beyond its scope, and would in fact permit a primary employer to largely insulate itself from the economic pressures legitimately exerted by those with whom it has a dispute simply by having another "neutral" contractor on the job accept delivery of, and retain title to, the supplies used by the primary employer. Our reading of *Denver Building* is not so broad. We note that in its decision, the Supreme Court carefully differentiated the situation involved in another case decided the same day, *NLRB v. Int'l Rice Milling Co.*, 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277 (1951), in which union pickets sought to convince a *customer's* employees not to enter the employer's grounds. It appears to us that *Denver Building* was merely clarifying the fact that Section 8(b)(4)'s ban on secondary activity applies between subcontractors or between contractors and subcontractors on the same construction project despite their common employment and the inevitable "relatedness" of each one's work as to the other's. We can thus find in

*Denver Building* no abiding principle to control this case. The decision does not answer the question of who is a customer or supplier of a primary employer; it simply held that not all contractors on a construction project can be considered the same employer for the purposes of picketing and strikes.

In this case, in contrast to the facts of *Denver Building* there is not the slightest hint that the pickets tried to induce employees of the other subcontractors working on the project to strike in order to force their employer not to deal with the project owner until he ceased to deal with Hoff. They were simply trying to put a stop to deliveries of electrical supplies to Hoff for its use in its business, in order to disrupt its day–to–day operations, perceiving Consolidated to be a "supplier" and thus a permissible object of the picketers' appeal under established rules. *Steelworkers, supra*, 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863. The picketing stopped when assurances were given that all deliveries of Hoff supplies would be through the reserved gate. Although *Denver Building* stands for the proposition that mere co–existence on a common situs as independent subcontractors for a common contractor does not automatically provide sufficient work relatedness to justify picketing of *all* subcontractors, as agents, employees, or suppliers of the main contractor, it does not deal with the question of the permissible scope of picketing when one subcontractor delivers goods to a job site to be used solely by another subcontractor who is the primary employer.

In attempting to define the customers and suppliers who must use a reserve gate in order to protect a neutral gate from picketing, we find more guidance in the *General Electric* decision.[7] The Court concluded in that case with the observation:

7. The dissent contends that two circuits have held that "the *General Electric* standard simply does not apply to construction site picketing cases." *Dissent* at note 21. We cannot agree with this interpretation of these two cases; they stand for no more than the proposition established in *Denver Building*, that a dispute with the general contractor does not justify picketing of an entire construction project, whether on the theory that all subcontractors are "employees" of the general contractor or on the theory that they are all doing "related

... if Gate 3–A was in fact used by employees of independent contractors who performed conventional maintenance work *necessary to the normal operations* of General Electric [the primary employer in the labor dispute], the use of the gate would have been a mingled one outside the bar of § 8(b)(4)(A). In short, such mixed use of this portion of the struck employer's premises would not bar picketing rights of the striking employees.

366 U.S. at 682, 81 S.Ct. at 1294 (emphasis added).[8]

This is, of course, the reasoning contained in *Linbeck Construction Corp. supra,* 550 F.2d 311, 331, where gravel owned by the general contractor but intended for the use of the primary subcontractor was delivered through a neutral gate, triggering picketing of that gate by the Union. The Board found and the Court of Appeals for the Fifth Circuit agreed that such deliveries–regardless of where legal title to the raw materials lay–were the equivalent of use of the neutral gate by the suppliers of the primary employer, and so justified picketing.

> The question in this case is whether legal ownership by a neutral employer of the materials to be used by the primary employer in its normal course of business removes the delivery of these materials from its traditional role as an activity subject to picketing by those who do demonstrate against the primary employer.... [T]he controlling question is not who has title to the goods, but is for whose use they are intended. Thus, any gate used to deliver materials essential to the primary employer's normal operations is subject to lawful picketing.

*Id.* at 317–18. Applying the principles underlying *General Electric* to the question of who is a "supplier" or "customer" to whom the pickets may legitimately appeal, we agree with the Board's rejection of any formalistic notion of legal ownership of materials delivered in favor of a more realistic analysis focusing on the intended use of the supplies. Thus if in fact and practice, Consolidated was delivering supplies which in the normal course of its business Hoff used and installed, Consolidated was a "supplier" of Hoff, no matter where legal title to the supplies might lie, and by using the south gate Consolidated contaminated its neutrality, permitting its picketing by the Union.

This test, while based on the same principles, is not as broad as the *General Electric* "work–relatedness" test developed for industrial plants where the struck employer is the owner of the plant.[9] Practically speak-

---

work." If the dissent means only to suggest, as do these cases, that the particular "work–relatedness" test developed in *General Electric* for industrial plans when the dispute is with the owner of the plant is not applicable to a situation where the labor dispute is with a single contractor on a construction site, we fully agree; not everyone on the site doing work "related" to Hoff's work need use the *reserved gate in order to maintain the integrity* of the reserved gate system. This adds nothing to our problem in this case, however, which is identifying the "customers and suppliers" who *are* legitimate objects of the union's appeal.

8. The Court added:
   While the record shows some such mingled use, it sheds no light on its extent. It may well turn out to be that the instances of these maintenance tasks were so insubstantial as to be treated by the Board as *de minimis.* We cannot here guess at the quantitative aspect of this problem. It calls for Board determination. For determination of the questions thus raised, the case must be re-

manded by the Court of Appeals to the Board.
   *Id.* at 682, 81 S.Ct. at 1294. In this case the use of the neutral gate by Consolidated was not *de minimis.* Although the picketing of the neutral gate began at the first instance that came to the Union's attention, in fact weekly or twice weekly deliveries were being made through that gate. ALJ Findings of Fact, Joint Appendix at 16.

9. Despite the fact that both raise common–situs picketing problems, the dissent draws a strict distinction between industrial plants and construction sites, arguing that the test of legitimate picketing must be different for the two. We are by no means convinced that the differences are so striking in all cases as the dissent would suggest; many industrial plants rely heavily on independent contractors for a variety of tasks. In each case, the question is the same; is the particular party an employee, supplier or customer of the struck employer, and thus a legitimate object of the union's appeal?

ing, all subcontractors on a common construction site are doing "related" work, in that if any one of them were shut down, the project would eventually grind to a halt. If *Denver Building* survived the *General Electric* decision, decided a decade later, the scope of permissible picketing in the construction industry is not so broad. The present status of the *Denver Building* principles need not be decided by us today, because we conclude that even if *Denver Building* retains its full vitality, the Board's decision in this case is correct. While not all subcontractors on a construction project are a proper object of picketing simply because they are doing related work, neither does *Denver Building* mandate an artificial test to determine who are a primary employer's suppliers and customers, based on contractual ties and legal ownership. "Suppliers" are a legitimate object of the picketer's appeal, and the common sense notion of a supplier is a party which delivers goods for the direct use of the primary employer in the normal course of its business. This is a far narrower concept than the *General Electric* "work-relatedness" test, and is fully consistent with *Denver Building*.

■ An "ownership" or "contractual responsibility" test as urged by Hoff here, would be too narrow, and encroach on the Union's legitimate rights. The Supreme Court has already rejected opportunities to look to legal ownership principles as a guideline to the permissible scope of picketing, in cases where the ownership of the situs of the dispute was urged as a distinguishing factor. In *General Electric*, the Court rejected the notion that ownership of the picketed premises by the primary employer rendered the picketing of the entire premises per se permissible.

In rejecting the ownership test in situations where two employers were performing work upon a common site, the Board

was naturally guided by this Court's opinion in *Rice Milling*, in which we indicated that the location of the picketing at the primary employer's premises was "not necessarily conclusive" of its legality. 341 U.S. at 671, 71 S.Ct. at 964. Where the work done by the secondary employees is unrelated to the normal operations of the primary employer, it is difficult to perceive how the pressure of picketing the entire situs is any less on the neutral employer merely because the picketing takes place at property owned by the struck employer.

366 U.S. at 679, 81 S.Ct. at 1292. And in *Carrier Corp., supra*, 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863, the fact that the railroad spur onto the primary employer's premises was owned by the neutral employer made no difference to the legality of the picketing at that location.[10] We find support in these cases for our conclusion that lack of legal ownership of materials which would otherwise be "supplies" of the primary employer does not affect the legality of picketing at their delivery point.

Finally, a rule which would require the Union to divine the legal complexities of the contractual relationships on a construction site, at the risk of committing an unfair labor practice, would be unfair and unrealistic. Surely the workers on the site and the Union picketers did not know and could not be expected to discriminate as to whether Hoff or the project owner owned the fixtures at the moment they passed through the gate. The picketers only saw Hoff employees pick them up, carry them out to the buildings, and install them. In that sense Consolidated was much more identified with Hoff than would have been suppliers of screws, tape or other material commonly used for a variety of purposes, no matter what their special use by Hoff or

We can find no justification in the Act or in precedent for carving out special, separate sets of rules and criteria dependent on the nature of the work site rather than on the relationship between the parties. *General Electric* and *Denver Building* need not be "reconciled" in so rigid or arbitrary a fashion.

**10.** *See also Seafarer's Int'l Union v. NLRB*, 265 F.2d 585 (D.C.Cir.1959), where the court refused to find the union in violation of 8(b)(4) for picketing a separately owned drydock where a boat which was the primary object of the strike was moored.

whether Hoff had title to them. A union engaged in a dispute with a primary employer has a right to picket to carry its appeal to that employer's "employees," "customers," and "suppliers." The Board's decision to apply a common sense definition to those words is reasonable, and furthers the purposes of the Act.

3. *The "Raw Materials" Argument:* Hoff next argues that even if the *Linbeck* principle were to be approved as a Board standard, this case is distinguishable on at least two grounds. It points out that in *Linbeck*, the deliveries were of crushed stone, raw materials to be used by the primary employer in its job of constructing storm sewers and parking lots. Hoff contends that a ruling by the Board to the effect that electrical fixtures are similarly "supplies" of their installer, and therefore their delivery can be picketed, has broad potential for mischief and will eventually destroy the careful balance of interests in common situs picketing situations. It is argued that while deliveries of wires, screws, or masking tape, the ingredients of electricians' work, might be picketed as "supplies" because they are "raw materials," necessary to an electrician's own work, the finished product, the light fixtures that are installed, are the work product of another independent subcontractor ordered by the owner.

We are not persuaded by Hoff's—or the dissent's—doomsday predictions that our ruling might be susceptible of covering virtually all suppliers or independent contractors in any integrated construction project, with "supplies" including the plaster for the walls or ceilings into which the fixtures are installed or the floors or beams on which the electricians stand to install them. We find it significant that this supplier delivered products used *only* by Hoff, not other subcontractors; therefore any disruption caused if the Union should be successful in its appeal to Consolidated's deliveries would not spread to anyone but the primary employer. The ease with which any impact on the other, neutral subcontractors on the site could be completely avoided, simply by requiring Consolidated to deliver its products through the reserved gate, illustrates the limited intended impact of the Union's action. We need not engage in any sophisticated discussions of more attenuated connections in other cases. We repeat Judge Prettyman's invocation that "[w]e do not intend here to make a ruling broader than the case before us." *Seafarers Int'l Union v. NLRB*, 265 F.2d 585, 590 (D.C.Cir.1959).

How far beyond these facts the Board's practical approach in defining "supplier" might go, we do not venture. The "for want of a nail, the shoe was lost" line of reasoning takes us too far afield from this case and involves easily distinguishable situations. The facts here are fully consistent with the Board's conclusion that the Union's picketing of the south gate was motivated entirely by a desire to reach the suppliers of Hoff, in order to disrupt Hoff's day-to-day activities through permissible economic pressure. Hoff could not install fixtures if they did not arrive; it is hard to think of a supply more essential to electrical installation work than light fixtures. We thus reject Hoff's contention that the notion of "supplies" is limited to raw materials which will be used by the primary employer.

4. *The "Change in Practice" Argument:* In this case, the ALJ, and subsequently the Board itself, rejected Hoff's final argument that in *Linbeck* the critical fact was that the general contractor had *altered* prior procedures in delivering the supplies, thus evidencing an intent to bypass exposure to legal picketing at the reserved gate.

In *Linbeck*, the primary employer and the "neutral" contractor who received and retained title to the crushed stone had deliberately altered their business practices to attempt to avoid the impact of picketing. Whereas the primary employer had initially ordered and received delivery of the raw materials, when it appeared picketing was imminent, legal title, ordering and delivery were simply shifted to another contractor. Thus if the primary employer were successful in convincing its own employees to cross the picket line and remain on the job, it

could continue its day–to–day operations unaffected by the Union's efforts to carry its message to the public, simply picking up its supplies as it needed them from the other contractor. This would completely eliminate a major element of the Union's right to picket, the right to try to persuade a primary employer's supplier not to deal with it for the duration of the labor dispute. We can see no difference in the impact on the Union's rights between this circumvention being accomplished in a deliberate attempt to diffuse the impact of picketing and its being accomplished by the contractual relationships set up at the beginning of the construction project. In either case, we approve the Board's looking to the realities of the relationships involved rather than to the formalities of legal title.[11] We affirm the Board's conclusion that no unfair labor practice was committed by the Union's picketing of the south gate.

## THE SITUS PICKETING

■ Although the Union had originally picketed only the north gate, after it withdrew its pickets from the south gate, it continued to picket along the fence to the southern edge of the site, nearest the buildings which were under construction. Hoff argues that this indicates that in fact, the Union's intent in moving from the north gate was to enmesh neutral employers in its dispute with Hoff. Hoff contends that since there was a reserved gate, at which the Union's message could be carried to all Hoff employees, there was no need to picket the southern fence in order to accomplish that concededly legitimate end, and thus an improper motive could be inferred. The Board dealt with this allegation by analyz-

ing the propriety of the southern fence picketing on its own merits. Finding the southern picketing entirely lawful under the *Moore Dry Dock* standards, the Board concluded that no unlawful intent could be inferred from it.

There cannot be any serious dispute that picketing the southern fence in fact satisfied the strictures of *Moore Dry Dock*. The picketing only occurred while Hoff employees were working on the new buildings, Hoff's workers were engaged in their normal business of doing electrical work, the picketing disclosed that the dispute was only with Hoff, and, since the project was located at the extreme southern tip of a 1600 foot construction site, picketing outside the fence at that point was clearly "reasonably close" to the situs of the dispute, where the Hoff employees were working.

Hoff is correct in its point that *Moore Dry Dock* is only an evidentiary tool, merely raising a presumption that the picketing is lawful absent affirmative evidence of unlawful secondary intent. Hoff contends that the very existence of a reserved date at which picketing could occur, plus the fact that other workers employed by neutral contractors could presumably also see the pickets, constitutes such evidence. We agree with the Board that this is not necessarily sufficient to rebut the presumption raised by satisfaction of the *Moore Dry Dock* standards. There is no evidence in the record of any direct appeal to employees of neutral contractors to engage in strikes or concerted activity, in order to force their employers to cease doing business with Hoff. The pickets did not ask

---

**11.** It is worth pointing out how narrow is the point of contention between our opinion and the dissent. We both agree that not all contractors working together on a construction site are legitimate objects of a union's appeal when the dispute is with but one of them; we agree that the reserved gate system may be used to isolate a dispute and protect neutral employers; and we agree that the struck employer's employees, customers and suppliers must use the reserved gate in order to maintain the integrity of the system. The only disagreement between us is whether, in making the

factual determination of whether a particular party is a "supplier" who must use the reserved gate, the Board is restricted to a mechanical determination of legal title and contractual relations, or whether it may apply a commonsense test focusing on who is actually delivering supplies for the use of the primary employer. We do not believe *Denver Building* mandates the former, and we believe a proper balance of the union's interests against those of the neutral employers on the job site is struck by the latter.

other unions to honor their picket line, to cease work, or to ask their employers to bring pressure on Hoff. Rather, the Union simply picketed, with signs indicating that its only dispute was with Hoff, as near as possible to where Hoff's employees were working. Its picketing was clearly targeted at Hoff's employees, and was thus lawful primary picketing.

The Board's dismissal of Hoff's unfair labor practice charges is affirmed.

WILKEY, Circuit Judge, dissenting:

The majority purports to decide this case on a principle "far narrower" than the *General Electric* work–relatedness standard, and "fully consistent" with the Supreme Court's standard in *Denver Building* for common situs construction picketing.[1] To judge by the majority's legal reasoning in the abstract, one might agree with this characterization and conclude that this decision follows from precedent and marks nothing very significant. But when one looks at the decision in light of the actual nature of independent contractor relationships on a construction site, it becomes apparent that the practical effect of the majority's holding makes serious inroads against the *Denver Building* rule, and worse, that any logical extension of the majority's reasoning to future common situs picketing cases would leave virtually nothing of *Denver Building* at all.

The difficulty in this case arises from the tension between the Supreme Court decisions in *General Electric* and *Denver Build-*

*ing*. The *General Electric* decision affirms the right of unions to picket gates used by customers and suppliers of an industrial plant, on grounds that this constitutes traditional primary picketing activity.[2] *Denver Building*, on the other hand, protects independent contractors at common situs construction projects from picketing by unions with grievances against other contractors working at the same construction site.[3] Our problem in the present case is that Consolidated Electric Supply Co. (Consolidated) appears to be both a common situs independent contractor *and* a supplier of Hoff Electric Co. (Hoff), the primary employer against whom the union bears its grievance. Consolidated seems to be an independent contractor within the *Denver Building* rule, because it has a separate arrangement to provide materials to the owner of the construction project on which Hoff works, an arrangement contracted for before Hoff was selected as the electrical subcontractor. On the other hand, Consolidated seems to be a supplier of Hoff within the *General Electric* rule, since the lighting fixtures it provides are installed by Hoff's electricians. As a result of this tension, it is a difficult question whether a union with a grievance against Hoff should be able to picket a separate gate used by Consolidated. I believe that an answer to this question does follow logically from an analysis of Supreme Court precedents in this area; it is an answer contrary to the majority's decision.

1. Maj. op. at 1272.

2. *Local 761, Int'l Union of Elec. Workers v. NLRB (General Electric)*, 366 U.S. 667, 680–81, 81 S.Ct. 1285, 1293, 6 L.Ed.2d 592 (1961). *See* maj. op. at 1269.

3. *NLRB v. Denver Bldg. Trades Council*, 341 U.S. 675, 687–90, 71 S.Ct. 943, 950–952, 95 L.Ed. 1284 (1951). *See* maj. op. at 1270. *Denver Building* did not involve the use of separate gates for the primary employer and other contractors, as have most subsequent cases in this area. When the construction site has separate gates, the picketing must meet the standards of the *Moore Dry Dock* case, *Sailors' Union of the Pacific*, 92 N.L.R.B. 547, 549 (1950), *set forth in* maj. op. at 1268. As applied in construction

industry cases, the *Moore Dry Dock* standards require that the union picket only the gate used by the contractor with whom the union has its primary dispute, and not picket separate gates used by other independent contractors. *See, e. g., Carpenters Local 470 v. NLRB*, 564 F.2d 1360, 1362 (9th Cir. 1977); *Markwell & Hartz, Inc. v. NLRB*, 387 F.2d 79, 81–83 (5th Cir. 1967), *cert. denied*, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968). A failure to meet the standards of *Moore Dry Dock* through picketing of gates used only by secondary employers, indicates an intent by the union to exert unlawful secondary pressures. *See Carpenters Local 470 v. NLRB*, 564 F.2d 1360, 1362–63 (9th Cir. 1977).

The majority resolved the above–described tension by applying a "common sense" definition of supplier: "if in fact and practice, Consolidated was delivering supplies which in the normal course of its business Hoff used and installed, Consolidated was a 'supplier' of Hoff . . . ."[4] The majority relies for this approach, as did the National Labor Relations Board (NLRB), on the *Linbeck Construction Corp.* case in the Fifth Circuit, which held that "any gate used to deliver materials essential to the primary employer's normal operations is subject to lawful picketing."[5] Under this approach it is easy to argue that Consolidated is a supplier of Hoff, that the *General Electric* rule permits picketing against Consolidated's delivery as traditional primary strike activity, and that Consolidated's claim of independent contractor status under *Denver Building* is unavailing.

This approach poses *two major problems*, however, which come to light only upon a consideration of the customary relationships of contractors at a common situs construction project. *First, far from being a rare or exceptional case, Consolidated's relationship with Hoff*–providing materials to the owner which are essential to Hoff's normal operation and are used and installed by Hoff–*is highly typical of the way business is done on a construction project.* Owners could prefer to order various items themselves for many reasons–perhaps to cut costs, perhaps to ensure that the items suit their personal tastes. In such instances an owner would quite likely contract with an electrical, plumbing, carpentry, or other type of firm *to install or assemble the* items. Any subcontractor hired to perform a skilled service will work with many items provided to the site by other contractors. The work on any construction site is so interrelated that many independent contractors can be called "suppliers" of other independent contractors.

To see the extent of this interrelationship–*and the extent to which the majority would cut into the Denver Building rule*–it is instructive to look at an illustration. An earlier construction site picketing case decided by the NLRB set forth the contract arrangements for a typical housing construction project. The NLRB decision lists the following contracts made by the general contractor American Modulars Corp. for the purchase of materials:

1.  *Crystal Park Lumber Co., Inc.*

American purchases decks, trusses, roof sheeting, exterior doors, exterior and interior wood trim, and stairs.

2.  *United States Steel Homes Division*

American purchases exterior and interior wall panels and soffit.

3.  *J. P. Loomis Co.*

American purchases concrete block and concrete window sills.

4.  *Akron Sales Co.*

American purchases brick.

5.  *Ornamental Iron Works*

American purchases steel I–beams.[6]

The NLRB decision went on to list the general contractor's contracts with other employers to work with the above materials:

1.  *W. B. Miller Construction Co.*
    a.  Foundation–concrete block walls
    b.  Exterior walls–brick
    c.  Window sills
2.  *Sondles*
    Erects the housing shell using:
    a.  Steel I–beams
    b.  Decks
    c.  Pre–fab walls–wall panels
    d.  Trusses
    e.  Roof sheeting
    f.  Exterior doors and trim
3.  *Alside*
    Places soffit under eaves.[7]

---

4.  Maj. op. at 1273.

5.  *Linbeck Constr. Corp. v. NLRB*, 550 F.2d 311, 318 (5th Cir. 1977) (affirming 219 N.L.R.B. 997 (1975)). *See* maj. op. at 1267–1268.

6.  *United Bhd. of Carpenters*, 203 N.L.R.B. 1112, 1115 (1973).

7.  *Id.*

In this illustration each of the second group of subcontractors used materials provided not by themselves or their direct suppliers, but rather by the general contractor through the contracts listed in the first group. *Any one of the first group of subcontractors could be termed a "supplier" of the second group, yet each is clearly an independent contractor in conventional usage.* There is no indication that this proliferation of independent contractors to supply the general contractor is an attempt to evade potential union picketing; it is simply the natural result when a general contractor hires firms with special skills, but finds it more economical or convenient to procure the materials independently for them to use.

Of course some subcontractors will have materials delivered to them by their suppliers in addition to or instead of using materials provided to the construction site by independent contractors. Such direct suppliers may of course be picketed under the reasoning of *Denver Building*, since they are not independent of the primary employer to whom they deliver. But the present case is far different: Consolidated is clearly independent of Hoff. Consolidated sold electrical fixtures directly to the owner; Hoff had no relationship with Consolidated and no direct relationship even with the owner, as Hoff was hired by the general contractor, and was hired for the purpose of installing the fixtures but not providing them.[8]

The effect of the majority's opinion is to take such independent contractors out of the *Denver Building* rule whenever they can be characterized as "suppliers," and to allow picketing of any service subcontractors to spread to the independent contractors who provide materials that they use. *This aspect of the decision alone creates a major exception to* Denver Building, *but the effect of the majority's opinion does not end here. Under the* General Electric *deci-*

sion, *"customers" are just as vulnerable to this treatment as "suppliers,"* which leads us to the second major problem posed by the majority opinion.

*General Electric* affirms the right of unions to picket not only suppliers entering the primary employer's site of work, but also customers.[9] Because in the present case the union did not claim the right to picket *customers* of Hoff, this second major problem did not enter directly into the majority's deliberation. But the reasoning of the majority's opinion leaves no logical ground for refusing to allow common situs picketing of consumers as well as suppliers of common situs contractors who become primary objects of picketing. Once again we see the same tension with *Denver Building*, since many independent contractors are, in a "common sense" view, customers of other independent contractors.

On a common situs construction project the extent of common sense customer relationships is just as broad as supplier relationships. The customer of Hoff or any other skilled service subcontractor is the person who receives the services; this would be either the general contractor or the owner. In the case of subcontractors who provide materials to the general contractor, their customers include not only the general contractor but also the other independent subcontractors that use, install, or assemble the materials.

If a union is allowed to picket all those who by a common sense view fall into the *General Electric* categories of supplier and customer, the union can vastly expand the targets of its picketing. We can trace the effects of the majority's reasoning in terms of our earlier illustration. The majority's holding as to suppliers allows a primary labor dispute with a skilled service contractor in the second group of contracts to spread to the "supplier" contractors in the

---

**8.** *Local 323, IBEW*, No. 12–CC–1006 (NLRB 3 Apr. 1979), *reprinted in* Appendix at 2, 13–16 (decision of ALJ).

**9.** *See Local 761, Int'l Union of Elec. Workers v. NLRB (General Electric)*, 366 U.S. 667, 680, 81 S.Ct. 1285, 1293, 6 L.Ed.2d 592 (1961).

first group; in similar fashion the majority's reasoning when applied logically to the customer side will allow a primary dispute against a subcontractor in the first group to spread to its customers in the second group.

*It is difficult to imagine any relationship between independent contractors that is not either supplier or customer.* Any subcontractor who performs skilled services has "suppliers" in those other contractors who provide the materials on which the skilled service contractor performs his work; and he has "customers" in those general contractors who contracted for his services. Any subcontractor who provides materials likewise has "customers" in those subcontractors that use and install the materials, and in those general contractors that ordered and accepted delivery of the materials.

*This web of supplier and customer relationships among contractors is precisely what is to be expected,* since contractors are admittedly closely interrelated on any typical construction site. Since they are engaged in a common enterprise, the work of any one contractor is related to and often essential for the work of many others. As a result, any judicial approach that rejects the "formalistic"[10] and "artificial"[11] distinctions among construction contractors and adopts instead "common sense" and a "realistic analysis"[12] of the relationships among them, will inevitably conclude, as the majority does here, that the contractors are not truly independent and that one cannot insulate itself from picketing against another. What this approach leaves of *Denver Building* is hard to see.

10. Maj. op. at 1271.

11. *Id.* at 1272.

12. *Id.* at 1272–1273.

13. *See Local 761, Int'l Union of Elec. Workers v. NLRB (General Electric),* 366 U.S. 667, 680–81, 81 S.Ct. 1285, 1293, 6 L.Ed.2d 592 (1961).

14. 29 U.S.C. § 158(b)(4)(i), (ii)(B) (1976). In separate–gate cases this conclusion is drawn from the combined effect of *Denver Building* and *Moore Dry Dock, see* note 3 *supra.* The *Denver Building* case respects the independent

The majority's approach results from the application of the *General Electric* standard for picketing of suppliers and customers to the situation of a construction project. The natural question to ask, then, is whether *General Electric* and *Denver Building* are simply inconsistent and irreconcilable, so that one decision must necessarily overrule or strictly limit the other. I think they are not, for reasons I will describe.

It is certainly true that the standards of the two cases conflict on the surface. *General Electric* allows picketing of suppliers, customers, and independent contractors performing tasks related to the normal operations of an industrial plant, even when they enter the plant through a separate reserved gate.[13] *Denver Building* deals with construction contractors whose tasks are clearly related to the normal operations of each other, and who under a realistic analysis are *de facto* suppliers and customers of each other in the typical case; yet *Denver Building* allows picketing only against the primary employer with whom the union has its grievance. If the union pickets secondary employers–other contractors entering the site–then *Denver Building* supports the conclusion that an object of the picketing is to induce the secondary employers to cease doing business with the primary, a violation of section 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act.[14]

In terms of the argument that secondary employers at a construction site are closely interrelated with the primary employer–contractor, *Denver Building does not deny the fact of interrelationship, but concludes that this fact does not eliminate their status*

nature of the different contractors engaged in a construction project. *See NLRB v. Denver Bldg. Trades Council,* 341 U.S. 675, 690, 71 S.Ct. 943, 952, 95 L.Ed. 1284 (1951). The *Moore Dry Dock* case prevents the picketing of independent secondary employers at gates not used by the primary employer, because such picketing is not limited in place and time to the activities of the primary employer. *Sailors' Union of the Pacific (Moore Dry Dock),* 92 N.L.R.B. 547, 549 (1950). *See Carpenters Local 470 v. NLRB,* 564 F.2d 1360, 1362–63 (9th Cir. 1977).

*as independent contractors*: "The business relationship of independent contractors is too well established in law to be overridden without clear language doing so."[15] It is this acceptance of customary independent contractor relationships, despite the close interrelationship of the contractors, that sets the *Denver Building* standard at odds with the *General Electric* standard.

But whether one of the cases must necessarily overrule the other is a different question. The second of the cases in time, *General Electric*, did not question the vitality of *Denver Building* in any way; its only mention of *Denver Building* was an approving citation on a collateral point.[16] Faced with this situation, we must give effect to *both* precedents, so long as there is a reasonable way to reconcile them. And in fact there is a way, because each of these cases applies logically to a different category of picketing situations: *Denver Building* pertains to common situs construction projects, while *General Electric* pertains to industrial plants of primary employers.

Lest this appear an arbitrary distinction, *it is important to note the real differences between the two situations. General Electric* protects the traditional right of unions to conduct picketing at a primary employer's industrial plant to influence employees, customers, and suppliers of that primary employer not to do business with him during the strike. In this context it *does* seem "artificial," as a kind of subterfuge, for a struck industrial plant to contract out all its normal operations and have independent contractors enter through separate gates to carry on the operations of the firm unimpeded by the picketers.[17] This means of operation appears artificial and devious because the customary manner of operation for an industrial plant is to carry out its on–site operations with its own employees, not by employing outside contractors.

On a common situs construction project, on the other hand, the customary practice is entirely different. Owners normally do perform construction operations by hiring outside contractors. General contractors typically engage subcontractors to perform skilled services and provide materials. *It is precisely because these contractor relationships are customary and not anti–strike subterfuges that the* Denver Building *Court could say that they are "too well established in the law to be overridden without clear language doing so."*[18]

Moreover, the common situs construction situation, because it customarily involves many independent employers, requires a delicate balancing of the congressional objective of "shielding unoffending employers and others from pressures in controversies not their own."[19] The unoffending employer's interest appears especially strong in "ambulatory situs" cases such as con-

**15.** *NLRB v. Denver Bldg. Trades Council*, 341 U.S. 675, 690–91, 71 S.Ct. 943, 952, 95 L.Ed. 1284 (1951).

**16.** *Local 761, Int'l Union of Elec. Workers v. NLRB (General Electric)*, 366 U.S. 667, 672, 81 S.Ct. 1285, 1288, 6 L.Ed.2d 592 (1961).

**17.** If this were allowed, the strikers would be restricted to picketing the separate gate reserved for the firm's regular employees, none of whom would enter the gate because not only are they on strike, but they have been replaced in their jobs by independent contractors. The right to strike and to picket, in this context, could become almost meaningless. Hence the holding of *General Electric*. The related "ally doctrine" aims to prevent much the same potential evisceration of the right to strike. *See e. g., NLRB v. Business Machine Mechanics Conference Board Local 459*, 228 F.2d 553 (2d

Cir. 1955), *cert. denied*, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956).

**18.** 341 U.S. at 690, 71 S.Ct. at 952. The majority refuses to respect these customary legal relationships among construction contractors when it states that "a rule which would require the Union to divine the legal complexities of the contractual relationships on a construction site, at the risk of committing an unfair labor practice, would be unfair and unrealistic." Maj. op. at 1272. Surely it is no more difficult for a union to discern legal relationships among contractors than to discern intended uses of materials and other *de facto* supplier and customer relationships as the majority's standard would require.

**19.** *NLRB v. Denver Bldg. Trades Council*, 341 U.S. at 692, 71 S.Ct. at 953.

struction projects.[20] In the industrial site context this interest is less deserving of protection, since contractors who enter a struck plant site to perform normal operations of the plant are in a sense making the plant's controversy their own: customarily they would not be engaged in such work but for the need to circumvent the strike. In the construction site context, by contrast, an independent contractor such as Consolidated typically enters its contract with the owner for reasons unrelated to any actual or expected strike.

We thus have ample reason to apply *General Electric* and *Denver Building* each in its own separate sphere, the first for industrial plant picketing, the second for common situs construction picketing. When the cases are reconciled in this manner—and it is very difficult to see any other way to reconcile them—the logical conclusion is that the *General Electric* standard simply does not apply to construction site picketing cases. Both the Sixth Circuit and the Ninth Circuit have arrived at this conclusion, refusing to apply *General Electric* to common situs construction projects.[21] In addition, a Fifth Circuit case has stated that the *General Electric* work–relatedness standard "does not apply to employers at a common construction situs,"[22] though that decision contains ambiguities on this point which will be discussed below.

Apparently mindful of the weight of this authority, the majority states that it is applying a "far narrower concept" than the *General Electric* standard, a concept "fully consistent with *Denver Building*."[23] But throughout its opinion the majority relies

on reasoning drawn directly from *General Electric*.[24] At the same time the majority declares: "We can thus find in *Denver Building* no abiding principle to control this case."[25] The fact is that the majority has decided a construction common situs case according to the standard of *General Electric* rather than *Denver Building*.

The majority's statement that its standard in this case is far narrower than that of *General Electric* is open to serious question. It may appear at first that the *General Electric* standard of "work–relatedness" is broader than the NLRB's standard, approved here by the majority, of "essential to the primary employer's normal operations."[26] But in fact when one applies the majority's "common sense" notion of *de facto* suppliers to the typical construction site picketing case, there is no substantial difference in result between the two standards. At one point in its opinion the *General Electric* Court phrased its standard in terms of work "necessary to the normal operations,"[27] thus leaving no vestige of difference in the majority's "essential to normal operations" standard.

It is true that the "essential to normal operations" language has been endorsed by the Fifth Circuit in *Linbeck Construction Corp. v. NLRB*,[28] the same case in which the Fifth Circuit stated that *General Electric* does not apply in the construction site context. In arriving at the "essential to normal operations" standard, however, the *Linbeck* court drew its analysis primarily from *General Electric* and a second industrial

20. *See Local 761, Int'l Union of Elec. Workers v. NLRB (General Electric)*, 366 U.S. 667, 677, 81 S.Ct. 1285, 1291, 6 L.Ed.2d 592 (1961).

21. *Carpenters Local 470 v. NLRB*, 564 F.2d 1360, 1362 (9th Cir. 1977); *NLRB v. Nashville Bldg. Trades Council*, 383 F.2d 562, 565–66 (6th Cir. 1967).

22. *Linbeck Constr. Corp. v. NLRB*, 550 F.2d 311, 316 (5th Cir. 1977) (citing *Markwell & Hartz, Inc. v. NLRB*, 387 F.2d 79 (5th Cir. 1967), *cert. denied*, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968)).

23. Maj. op. at 1272.

24. *See* maj. op. at 1268, 1269, 1271, 1272. *See also id.* at 1269–1270 (relying on another industrial plant picketing case, *United Steelworkers v. NLRB (Carrier Corp.)*, 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964)).

25. Maj. op. at 1271.

26. *Id.* at 1268.

27. 366 U.S. at 682, 81 S.Ct. at 1294.

28. 550 F.2d 311 (5th Cir. 1977).

plant picketing case.[29] If *General Electric* is truly not applicable to construction site cases, then we should not now apply a standard based on the reasoning of *General Electric* and other industrial plant cases.[30] To do so, as we have shown, would be contrary to the *Denver Building* precedent.

To appreciate the tendency of the majority's reasoning to undermine if not overrule *Denver Building*, it is instructive to note the close parallel between the majority's reasoning and that of Justice Douglas in his *Denver Building* dissent. As we have seen, the majority substitutes a common sense, realistic assessment of contractor interrelationships in place of a formalistic distinction among contractors based on factors such as legal ownership.[31] Justice Douglas apparently recognized that this line of reasoning ran directly contrary to the *Denver Building* decision, for he argued in dissent that the Court had made the right to strike "dependent on fortuitous business arrangements that have no significance so far as the evils of the secondary boycott are concerned,"[32] and that "[t]he presence of a subcontractor does not alter one whit the realities of the situation."[33] It goes without saying that to follow this line of reasoning consistently is to overrule *Denver Building*.[34]

There is one further important argument against nibbling away at the *Denver Building* rule and its respect for customary independent contractor relationships at construction sites. Ever since the Supreme Court's decision in 1951, *Denver Building* has been the object of almost annual attempts by Congress to overrule it legislatively. Courts normally hesitate to reverse a statutory interpretation, since Congress can change it by legislation if it wishes. This reluctance is most fully warranted when Congress deliberates at length whether to overrule legislatively and decides not to.

Common situs picketing has received ample legislative attention recently. Opponents of *Denver Building* have pressed the argument that "the realities of the situation" show that construction contractors are

---

**29.** *See Linbeck Constr. Corp. v. NLRB*, 550 F.2d at 317–18.

**30.** Nevertheless, the *result* in *Linbeck*, as opposed to the reasoning and "essential" standard, is not necessarily contrary to the analysis presented here. The *Linbeck* case involved a transfer of contractual ownership of goods normally supplied to the subcontractor who was the primary object of the union's grievance. Contracts were revised so that the goods were delivered by contract to the general contractor rather than the subcontractor; this change took place after the general contractor heard rumors of impending strike activity and only four days before the picketing began. *See id.* at 318. Moreover, the goods were raw materials of the sort customarily ordered by the subcontractor and not the general contractor in such situations.

A sham or subterfuge contractor relationship might fall outside the rationale of *Denver Building*, discussed above, which was intended to respect *customary* contractor relationships on a construction site. In the present case there is no need to decide whether a "subterfuge" exception might be appropriate in construction picketing cases, since the contractual relationships on the site where Hoff worked were established well in advance of any picketing threat, even in advance of the selection of Hoff as subcontractor.

**31.** *See* maj. op. at 1271–1272.

**32.** *NLRB v. Denver Bldg. Trades Council*, 341 U.S. 675, 693, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951) (Douglas, J., dissenting).

**33.** *Id.*

**34.** Despite the broad implications of the majority's reasoning in this case, which would severely limit *Denver Building*, the majority does suggest a much narrower basis on which its opinion might stand. The majority mentions that Consolidated delivered supplies *only* for Hoff, not for the use of other subcontractors. While one might design a new exception to *Denver Building* along these lines, there is no convincing principled reason to do so. Customarily contractors often deliver materials to a construction site for the use of only one skilled service contractor, as can be seen in the illustration on pp. 1268–1269 *supra*: lumber for carpenters, bricks for masons, etc. If typical construction arrangements often have independent contractors deliver such materials that only one other contractor can use, there is no more reason to deny the independence of this relationship than of any other independent contractor relationship on the site.

closely interrelated, and that "fortuitous business arrangements" among contractors should not insulate them from picketing.[35] A common situs picketing bill failed in 1975 for lack of congressional override of a presidential veto.[36] In 1977 a bill containing similar provisions failed to win a majority in the House.[37] The latter bill was intended expressly to apply the reasoning of *General Electric* to common situs construction picketing.[38] I see no reason for this court now to hand to the losers the prize that eluded them in Congress.

The significance of this case might appear less if it were not the third in a series of heretofore unsuccessful attempts by this court to broaden the permissible scope of secondary boycott activity. Because of the fine line between primary and secondary strike activity, all the rules prohibiting secondary boycotts are susceptible to being swallowed by superficially plausible exceptions. In two other controversial areas of secondary boycott activity, this court has shown an inclination to cut back on the protections against secondary boycotts. Two of our en banc decisions of recent years have unsuccessfully attempted to expand the permissible scope of secondary picketing of struck products sold by neutral businesses,[39] and to broaden the extent to which work preservation agreements may justify the exertion of secondary boycott pressures.[40] In both cases a sharply divided en banc Court of Appeals decision was reversed by the Supreme Court.[41] The majority's decision in the present case represents,

I believe, yet *one more attempt to expand an exception to the secondary boycott prohibition to the point that the exception overshadows the rule.*

The proper disposition of this case is to hold that the National Labor Relations Board applied an improper standard—a standard contrary to *Denver Building*—when it decided this construction site picketing case according to the reasoning and standards of *General Electric*. The case should be remanded to the Board for consideration under the terms of *Denver Building* and the *Moore Dry Dock* case, rather than *General Electric*. Under the proper standard, the issue for decision would be whether the picketing of the gate used by Consolidated was a secondary boycott effort to induce either Consolidated, or the owner of the project, or the general contractor, to cease doing business with Hoff.[42]

Because the majority affirms a Board order decided according to an improper standard, I must dissent.

35. *See* S. Rep. No. 438, 94th Cong., 1st Sess. 10–11 (1975) (quoting *NLRB v. Denver Bldg. Trades Council*, 341 U.S. 675, 693, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951) (Douglas, J., dissenting)).

36. H.R. 5900. *See* 121 Cong. Rec. 42,015 (1975).

37. H.R. 4250. *See* Cong. Rec. H2517 (daily ed. 23 March 1977).

38. H.Rep.No. 96, 95th Cong., 1st Sess. 6 (1977).

39. *NLRB v. Retail Store Employees Union (Safeco)*, 627 F.2d 1133, (D.C.Cir. 1979) (en banc), rev'd, 447 U.S. 607, 100 S.Ct. 2372, 65 L.Ed.2d 377 (U.S.1980).

40. *Enterprise Ass'n of Steam Pipefitters v. NLRB*, 521 F.2d 885 (D.C.Cir. 1975) (en banc), rev'd, 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977).

41. In a third case along similar lines, involving "hot cargo" and work preservation agreements, a divided panel decision of this court was affirmed this year by a 5–4 Supreme Court decision. *See NLRB v. International Longshoremen's Ass'n*, 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289, (1980) (affirming 613 F.2d 890 (D.C.Cir. 1979)).

42. *See* 29 U.S.C. § 158(b)(4) (1976).